IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PITT MCGEHEE PALMER BONANNI
& RIVERS, P.C., a Michigan professional
corporation,

      Plaintiff,

vs.

                                Hon:
                                Case No.:

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA,
a Connecticut domiciled insurance company,

      Defendant.

_____

## COMPLAINT AND JURY DEMAND

## PRELIMINARY STATEMENT

1. This action is for breach of contract, declaratory relief and bad faith claim handling arising out of Travelers Casualty and Surety Company of America's ("Travelers") unjustified refusal to provide insurance coverage under a Crime insurance policy providing insurance coverage to the Law Firm of Pitt McGehee Palmer Bonanni & Rivers, P.C. ("Firm").

2. The Firm is a Named Insured under Travelers "Wrap +" insurance policy, Policy No. 106328657 for the Policy Period of March 17, 2022 to March 17, 2023 ("Policy"), which specifically provides Crime coverage for losses resulting from "Funds Transfer Fraud."

3. The Firm was the victim of Funds Transfer Fraud in which the financial institution holding lawsuit settlement funds owned by the Firm was deceived by fraudulent wire disbursement emails received from perpetrators posing as authorized Firm personnel. Without knowledge, consent, or authentication by the Firm, and acting on the fraudulent emails containing false wire instructions, the Firm's financial institution transferred funds to accounts maintained by the criminals. When the fraud was discovered, some funds wired to accounts maintained by the criminals were successfully recalled. The total loss to the Firm was $1,602,107.98.

4. The Firm purchased the Policy because it was designed to protect the Firm against precisely the type of loss incurred resulting from Funds Transfer Fraud.

5. Even though the Firm paid its premiums, gave prompt notice of this crime to Travelers, and cooperated fully and completely with Travelers' inquiry into the fraud, Travelers has failed and refused to pay the Firm's claim of $1,597,107.98 ($1,602,107.98 minus the $5,000.00 deductible) for its losses (the "Claim") under the Policy.

6. The Policy limits for this coverage is $1,000,000.00 with $5,000 deductible. Travelers owes the Firm $1,000,000.00.

7. Travelers refused to pay the Claim in bad faith and this denial constitutes a breach of the Policy and its contractual obligations.

8. The Firm also seeks a declaration that the Policy provides coverage for

the Claim.

## PARTIES

9. The Firm is a professional Michigan corporation with its principal place of business in Royal Oak, Michigan.

10. Travelers is an insurance company organized and domiciled under the law of the State of Connecticut with its principal place of business in Hartford, Connecticut.

11. Travelers is authorized to sell or write property and casualty insurance in Michigan and, at all material times, has conducted and continues to conduct substantial insurance business in the State of Michigan, including engaging in the business of selling insurance, investigating claims, and/or issuing policies that cover policyholders or activities located in Michigan.

## JURISDICTION AND VENUE

12. Travelers is a Connecticut Corporation with its principal place of business in Connecticut.

13. The Firm is a Michigan Professional Corporation with its principal place of business in Michigan.

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds

$75,000, exclusive of interests and costs.

15. Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**A.    Relevant Portions of the Travelers' Policy**

16. In consideration of significant premiums paid to cover exactly the type of loss at issue here, Travelers sold the Policy to the Firm for the policy period of March 17, 2022, to March 17, 2023. This Policy is attached as Exhibit A.

17. The Declarations page of the Policy provides a Single Loss Limit of $1,000,000.00 and a $5,000.00 deductible for Funds Transfer Fraud. The Firm owned the stolen property. The Policy defines "Property" as follows:

18. "The property covered under this Crime Policy…. below is limited to property:

> i. that the Insured owns or leases;
> ii. that the Insured holds for others:
> on the Insured's Premises or the Insured's Financial Institution Premises; or while in transit and in the care and custody of a Messenger; or
> iii. for which the Insured is legally liable, except for property located inside the insured's Client's Premises or the Insured's Client's Financial Institution Premises." *Policy, p.17*

19. The loss was the result of Funds Transfer Fraud. The Policy provides that "[t]he Company will pay the Insured for the Insured's direct loss of Money and Securities contained in the Insured's Transfer Account directly caused by Funds

4

Transfer Fraud." *Policy, p. 4*

20. The Policy defines "Funds Transfer Fraud" as follows:

    1. an electronic, telegraphic, cable, teletype or telephone instruction fraudulently transmitted to a Financial Institution directing such institution to debit a Transfer Account and to transfer, pay or deliver Money or Securities from the Transfer Account which instruction purports to have been transmitted by the Insured, but was in fact fraudulently transmitted by someone other than the Insured without the Insured's knowledge or consent;

    2. fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a Financial Institution directing such Financial Institution to debit a Transfer Account and to transfer, pay or deliver Money or Securities from such Transfer Account by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the Insured but was in fact fraudulently issued, Forged or altered by someone other than the Insured without the Insured's knowledge or consent; or

    3. an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the Insured, which purports to have been transmitted by an Employee, but which was in fact fraudulently transmitted by someone else without the Insured's or the Employee's consent. *Policy, p. 10.*

21. The Policy defines a "Financial Institution" as follows:

    a. "A bank, trust company, savings bank, credit union, savings and loan association or similar thrift institution, or a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution." *Policy, p.10*

22. The Policy defines a "Transfer Account" as follows:

"an account maintained by the Insured at a Financial Institution from which the Insured can initiate the transfer, payment or delivery of Money or Securities:

by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

by means of written instructions (other than those described in Insuring Agreements B. and H.1.) establishing the conditions under which such transfers are to be initiated by such Financial Institution through an electronic funds transfer system." *Policy, p. 14.*

23. The Policy permits legal action against Travelers as follows:

   a. "The Insured may not bring any legal action against the Company involving loss:

      i. unless the Insured has complied with all the terms of this Crime Policy;
      ii. until 90 days after the Insured has filed proof of loss with the Company; and
      iii. unless brought within two (2) years from the date the Insured Discovers the loss." *Policy, p. 22*

24. A proper Proof of Loss was filed with Travelers on September 23, 2022.

25. This action was filed more than 90 days after the filing of the Proof of Loss.

### Statement of Facts Relative to the Crime

26. On or about June 2, 2022, the Firm retained Eastern Point Trust Company ("EPTC") to establish and administer a Qualified Settlement Fund

6

("QSF") for the purpose of receiving, holding, and ultimately distributing settlement proceeds and attorney fees arising from the resolution of claims in a matter pending in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division, *In re: USA Gymnastics, Chapter 11*, Case No. 18- 09108-RLM-11 ("the Litigation").

27. EPTC created a QSF for the Firm called the Pitt McGehee USAG Qualified Settlement Fund .

28. EPTC was designated "Trustee" [1] of the Fund and as a fiduciary it was obligated to maintain, establish, implement, utilize and adhere to commercially reasonable security policies and procedures with respect to the preservation of monies deposited into the Fund as well as to act with care, diligence, integrity, fidelity, and sound business judgment and honesty, loyalty, restraint from self-interest and good faith in connection with its duty to protect and preserve the Fund assets.

29. On June 10, 2022, at the direction of the Firm, the USAG funds in the aggregate amount of $20,031,154.71 was paid by the Bankruptcy Trustee to EPTC on behalf of the Firm's 25 clients.

---

[1] Although EPTC was clearly a fiduciary and owed the Firm a higher standard care because of its fiduciary status, it allowed the Firm to withdraw funds from the transfer fund on demand. EPTC personnel did not require approval from the "Trustee" to effectuate the Firm's transfer requests. Thus, when it came to Firm requests from the transfer fund, EPTC as "Trustee" did not have to approve or authorize the Firm's requests to transfer funds.

7

30. EPTC established a Transfer Fund ("Fund") that allowed the Firm to transfer funds to Claimants and to the Firm on demand.

31. When the funds were transferred to EPTC, an Allocator, approved by the Bankruptcy Court, had already designated the amount each of the Firm's Clients would receive from the aggregate amount.

32. The Firm's contingent fees of 1/3 of the recoveries plus a Common Benefit fee were included in this aggregate amount. Thus, each Client had a vested right in her share of the aggregate amount and the Firm, by state law, had a vested right to its 1/3 contingent fees from each client share and had a vested right to the Common Benefit Fees awarded by the Court.[2]

33. With each Client disbursement, EPTC would aggregate the attorney fees in the Fund and pay the attorney fees out to the Firm as directed by the Firm. Authorization from the "Trustee" was never required.

34. By June 15, 2022, the Firm had directed EPTC to make distributions to 16 of its clients. Without exception, the Firm completed a "QSF Petition for Distribution of Claimant Proceeds" which was emailed to EPTC staff. EPTC staff, in all 16 cases, made the distributions on demand as instructed by the Firm.

---

[2] Unlike other aggregate settlements where the UNALLOCATED shares are transferred by the Defendant to the QSF, the QSF here received ALLOCATED shares which had attached to them the Firm's 1/3 contingent fee. The Firm had a vested right in its fees. Michigan acknowledges a common-law charging lien. The charging lien is the most common form of lien used by courts and practitioners. The charging lien is a "charge," or lien, created on any money that may come into the attorney's hands as a result of a judgment that the attorney has obtained for his or her client.

Authorization from the "Trustee" was not required. The transactions with EPTC were identical to transactions the Firm would have with its commercial bank in directing Client distributions.

35. On June 25, 2022, the Firm withdrew from the Fund a portion of its attorney fees in the amount of $2,183,841.50. Once again, the payment was made on demand from the Firm. The "Trustee" did not have to authorize this payment.

36. On July 23, 2022, the Firm withdrew from the Fund an additional portion of its attorney fees in the amount of $523,667.75. As before, this payment was made on demand from the Firm and did not require authorization from the "Trustee."

37. By July 26, 2022, all but two Clients had received their distributions. The Firm's fees and the Common Benefit fees continued to accumulate in the Fund.

38. The fraud at issue in this case occurred after July 26, 2022. Beginning on or about July 26, 2022, the criminal(s) began to send fraudulent emails to EPTC impersonating an employee of the Firm in an attempt to induce EPTC to make distributions from the Fund. The Firm was blinded from seeing the criminal's emails and EPTC did not have in place an authentication process whereby Firm employees were asked to verify and authenticate wire requests.

39. The Firm discovered the fraud on August 16, 2022. The initial investigation revealed a loss of about $3.4 million. It was soon discovered that a portion of this loss ($961,450) had been placed by the criminal into the Firm's Level

9

One bank account. EPTC was also able to claw back from Wells Fargo Bank $853,657.98 on August 26, 2022.

40. The net loss to the Firm was $1,602,107.98. All the stolen money was either the Firm's attorney fees or its vested Common Benefit Fees.

41. All Firm Clients have received 100% of their settlements.

42. The Firm experienced a direct loss as a result of the Funds Transfer Fraud crime as defined by the Policy.

43. On August 18, 2022, prior to Travelers' receipt of the Firm's Proof of Loss, Travelers denied the Firm's Claim under the Crime Policy.

44. On April 13, 2023, in response to the Firm's Proof of Loss filed in September 2022, Travelers issued a second denial of claim letter.

45. Travelers has wrongly claimed that the Firm did not own the stolen property. The Policy does not define "ownership." Travelers has not produced any evidence to contradict the Firm's assertion that the payments from the transfer fund held by EPTC were payable to the Firm and its clients on demand without restriction. Ignoring these undisputed facts which establish Firm's ownership of the transfer fund, Travelers, in bad faith, avoids paying a valid Transfer Funds Fraud claim by pointing to irrelevant "ownership" case law including an automobile no-fault case (*Twichel v MIC*), a Medicaid eligibility case (*Hegadorn v Dep't of Human Servs. Dir.*) and a domestic relations dispute over attorney fees *(Souden v Souden)*.

46. The Firm had unfettered control over disbursements from the Fund. The EPTC "Trustee" designation was nominal because the Firm exercised total control of the Fund and prior approval for disbursements by the "Trustee" was never required.

47. The Fund was held in a revocable Trust and the Firm, as Settlor and beneficiary of the Trust, could revoke the Trust at any time for any reason without approval from the Trustee or any other authority.

48. Travelers seeks to avoid its obligations under the Policy by failing to cite a key feature of the Policy: EPTC, as a Trust Company is included in the definition of "Financial Institution." By ignoring this provision of the Policy, Travelers has denied the claim in bad faith by wrongly concluding that the Firm's funds under the control of EPTC was not "an account maintained by the Insured at a Financial Institution from which the Insured can initiate the transfer, payment or delivery of Money or Securities…"

49. Based on these misrepresentations of law and in failing to evaluate the claim by relying on important sections of the Policy, the claim was not "reasonably in dispute" and the denial of the Claim was therefore in bad faith.

## COUNT 1: BREACH OF CONTRACT

50. Plaintiff incorporates herein by reference paragraphs 1-49 as if each is set forth fully herein.

51. The Policy is a valid and binding contract between the Firm and

11

Travelers, and Travelers has wrongly asserted that the Policy does not cover the Firm's direct loss experienced from the Funds Transfer Fraud as that coverage is defined in the Policy.

52. The terms of the Policy provide that Travelers "will pay the Insured for the Insured's direct loss of . . . Money . . . directly caused by Funds Transfer Fraud."

53. The Firm has fully performed its obligations under the Policy, including all conditions precedent.

54. Travelers breached the Policy by refusing to indemnify the Firm for this loss.

55. As a result of Travelers' breach of the Policy, the Firm has suffered damages in the amount of $1,000,000.

## COUNT II: DECLARATORY RELIEF

56. Plaintiff incorporates herein by reference paragraphs 1-55 as if each is set forth fully herein.

57. Pursuant to the terms of the Policy, Travelers is obligated to pay the Firm, up to the $1,000,000 limit of liability, for the direct loss of "Money" that is caused by Funds Transfer Fraud.

58. As detailed above, the facts of the Claim come within the Funds Transfer Fraud provisions of the Policy and its other terms and conditions.

59. There are no exclusions in the Policy that bar coverage for this Claim.

60. Travelers disputes that it has a legal obligation to pay the Claim.

61. Pursuant to 28 U.S.C. § 2201, the Firm is entitled to a declaration by the Court of Travelers' obligations under the Policy.

62. An actionable and justiciable controversy exists between the Firm and Travelers concerning the proper construction of the Policy, and the rights and obligations of the parties thereto, with respect to the Claim for the Fraudulent Wire Transfers.

63. The Firm is entitled to a declaration that there is coverage available to it for the Fraudulent Wire Transfers under the Policy, and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper.

**COUNT III: STATUTORY BAD FAITH, MCL 500.2006**

64. Plaintiff incorporates herein by reference paragraphs 1-63 as if each is set forth fully herein.

65. By reason of conduct of Travelers in wrongfully failing to timely pay this Claim that is not reasonably in dispute, the Firm has suffered an additional loss.

66. Travelers by failing to comply with MCL 500.2006 is obligated to pay the Firm twelve percent (12%) per annum interest on the amount of Firm's Claim commencing sixty (60) days after the filing of the Proof of Loss on September 23, 2022 and continuing to accrue until paid.

## REQUEST FOR RELIEF

WHEREFORE, the Firm requests relief as follows:

(a) Plaintiff requests that the Court enter judgment against Travelers, awarding Plaintiff damages in the amount of $1,000,000.00, plus all consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(b) Plaintiff requests that this Court find Defendant has failed to comply with MCL 500.2006, and award the Firm twelve percent (12%) per annum interest on the amount of the Firm's Claim of $1,000,000.00 from September 23, 2022, and continuing to accrue until paid;

(c) Plaintiff requests that this Court enter a Declaratory Judgment in favor of the Firm against Travelers which declares that Travelers is obligated to pay Firm, up to the applicable limits of the Policy, for the Claim; and

(d) Plaintiff requests its attorney's fees and costs and any such other relief that this Honorable Court deems equitable, just or proper.

                                      Respectfully submitted,

                       Pitt McGehee Palmer Bonanni & Rivers, PC

                                  By: */s/ Michael L. Pitt*
                                  Michael L. Pitt P24469
                                  Beth M. Rivers P33614
                                  Megan Bonanni P52079
                                  Attorneys for Plaintiff
                                  117 W. Fourth St., Suite 200
                                  Royal Oak, MI 48067
                                  (248) 398-9800
                                  mpitt@pittlawpc.com
                                  mbonanni@pittlawpc.com
                                  brivers@pittlawpc.com

Dated: April 20, 2023

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PITT MCGEHEE PALMER BONANNI
& RIVERS, P.C., a Michigan professional
corporation,

    Plaintiff,

vs.

TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA,
a Connecticut domiciled insurance company,

    Defendant.

Hon:
Case No.:

---

## DEMAND FOR JURY

Plaintiff, Pitt McGehee Palmer Bonanni &Rivers, PC, request a trial by jury of the within cause.

    Respectfully submitted,

    Pitt McGehee Palmer Bonanni & Rivers, PC

    By: */s/ Michael L. Pitt*
    Michael L. Pitt P24469
    Megan A Bonanni P52079
    Beth M. Rivers P33614
    Attorneys for Plaintiff
    117 W. Fourth St., Suite 200
    Royal Oak, MI 48067
    (248) 398-9800
    mpitt@pittlawpc.com
    mbonanni@pittlawpc.com

Dated: April 20, 2023    brivers@pittlawpc.com