# Exhibit 1



**PO Box 2950**
**Hartford, CT 06104-2950**

March 17, 2022

Pitt, McGehee, Palmer, Bonanni & Rivers, PC
117 W. FOURTH ST., SUITE 200
ROYAL OAK, MI 48067

Re: Important Information about <u>Claims Information Line</u>

Dear Pitt, McGehee, Palmer, Bonanni & Rivers, PC

Travelers Bond & Specialty Insurance is pleased to announce its **1-800-842-8496** Claims Information Line.  This line is designed to provide insureds with an additional resource on how to report claims or those circumstances or events which may become claims.

Policyholders will be able to obtain assistance on the following topics from the Claims Information Line:

- The information that needs to be included with the claim notice
- The address, electronic mail address and/or facsimile number to which the policyholder can send claims related information
- Get questions on the claim process answered

The Declarations Page of your policy sets forth where you should report claims and claims related information.  You should also review the policy's reporting requirements to be aware of how much time you have to report a claim to Travelers.  The sooner Travelers is notified, the sooner we can become involved in the process and offer assistance to our policyholder.  A delay in reporting may result in all or part of a matter to fall outside of the coverage provided.

The Claims Information Line should streamline the claim reporting process and allow policyholders to ask questions on what information is needed as well as other questions which will assist them in working with Travelers.  While the Claims Information Line provides policyholders a valuable resource by answering questions and providing information, the line does not replace the reporting requirements contained in the Policy.

We hope this improvement to customer service is something our policyholders will find helps them understand the claim process and provides them a resource for reporting.





# CyberRisk Policyholder Benefits

Thank you for choosing Travelers for your cyber insurance needs. As our insured, Travelers provides you with innovative value-added pre and post breach risk management services at **no additional cost** to help you protect your business. These current benefits include:

## Travelers *eRisk Hub*®:

Access to a private web-based portal containing information and technical resources that can assist you in the prevention of network, cyber and privacy events and support you in a timely response if an incident occurs. Travelers *eRisk Hub* portal powered by *NetDiligence*® features news, content and services from leading practitioners in risk management, computer forensics, forensic accounting, crisis communications, legal counsel, and other highly-specialized segments of cyber risk.

### To register for Travelers *eRisk Hub*:

1. **Go to www.eriskhub.com/travelerscyber**
2. **Complete the registration form. Your Access Code is 13881-197**
3. **Once registered, you can access the portal immediately.**

**Please note the following:**

- Travelers *eRisk Hub* is a private site provided to certain cyber insureds of Travelers. Please do not share portal access instructions with anyone outside your organization. You are responsible for maintaining the confidentiality of the Access Code provided.

- Travelers *eRisk Hub* contains a directory of experienced providers of cyber risk management and breach recovery services. Travelers does not endorse these companies or their respective services. Before you engage any of these companies, we urge you to conduct your own due diligence to ensure the companies and their services meet your needs Unless otherwise indicated or approved, payment for services provided by these companies is your responsibility.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that  coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law.

© 2017 The Travelers Indemnity Company. All rights reserved. LTR-19027 Rev. 04-17

# CyberRisk Policyholder Benefits

**Travelers Cyber Coaches –**

Three cybersecurity coach services are available to help your organization extend your team with expert guidance at no additional cost, as follows:

- **Breach Coach® –**
  Should you experience a data breach event, you may choose to call the Breach Coach listed in the Travelers *eRisk Hub* portal for immediate triage assistance. Your initial consultation of up to one half-hour is at no additional charge. Please be aware that the Breach Coach service is provided by a third-party law firm. Therefore,contacting the Breach Coach does NOT satisfy the claim or first-party notification requirements of your policy.

- **HIPAA Coach –**

  To help your organization identify the cyber related issues HIPAA raises and help minimize potential exposures, you are entitled to consult with a HIPAA Coach listed in the Travelers *eRisk Hub* portal for up to one hour.

- **Security Coach –**
  Talk with a Symantec™ security professional about general cybersecurity questions for up to one hour to help strengthen your organizations security posture with actionable advice and insights listed in the Travelers *eRisk Hub* portal.

**Pre-Breach Services provided by Symantec™ :**
Preparation is key in helping to mitigate a potential cyber related event. To assist policyholders achieve a higher level of cybersecurity for their organizations Travelers offers the following pre-breach services from Symantec, a global leader in cybersecurity solutions accessible through the Travelers *eRisk Hub*:

- **Symantec™ Cyber Resilience Readiness Assessment and Cyber Security Professional Consultation –**
  An online assessment designed for an organization to quickly understand their current cybersecurity posture while receiving an official report and up to 1 hour consultation with a Symantec security professional to help in improving areas of weakness or vulnerability.

- **Symantec™ Cyber Security Awareness Training Videos –**

  Gain access to security awareness training videos as a method of defense against cybersecurity threats by promoting proactive employee behavior. These courses can be used to complement your employee training requirements.

- **Symantec™ Service Discounts –**

  Obtain meaningful discounts on Symantec products and services including Managed Security Services, Norton for Small Business Software, DeepSight™ Intelligence, Endpoint Encryption, Phishing Readiness and more.

- **Risk Management Whitepapers –**

  Topical insights and expertise on current cyber related trends, risks and threats that face organizations in today's business environment. Available quarterly, these resource guides will help with your organization's preparedness when it comes to cyber related events.

Certain services are being provided to you by Symantec and in using them you must agree to Symantec's terms of use & privacy policy. Travelers Casualty and Surety Company of America and its property casualty affiliates ("Travelers") makes no warranty, guarantee, or representation as to the accuracy or sufficiency of any such services. The use of the services and the implementation of any product or practices suggested by Symantec or NetDiligence is at your sole discretion. Travelers disclaims all warranties, express or implied. In no event will Travelers be liable in contract or in tort for any loss arising out of the use of the services or Symantec's or any other vendor's products. eRisk Hub and Breach Coach are registered trademarks of NetDiligence.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that  coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law.

© 2017 The Travelers Indemnity Company. All rights reserved. LTR-19027 Rev. 04-17



P.O. Box 2950
Hartford, CT 06104-2950

03/17/2022

Pitt, McGehee, Palmer, Bonanni & Rivers, PC

117 W. FOURTH ST., SUITE 200
ROYAL OAK, MI 48067

**RE: Risk Management PLUS+ Online® from Travelers Bond & Specialty Insurance (www.rmplusonline.com)**

As a Travelers Bond & Specialty Insured you receive risk management services, at no additional cost, to help protect you and your business.

Risk Management PLUS+ Online, is a robust website to assist you in the mitigation of risk relative to employment practices, directors and officers, fiduciary liability, cyber, crime, kidnap & ransom, and identity fraud exposures.

Highlights of Risk Management PLUS+ Online include:
- ☒ Thousands of articles on a variety of risk management topics
- ☒ Topical webinars and podcasts on current issues
- ☒ Checklists to assist in managing risk
- ☒ Web based training
- ☒ Model Employee Handbook, including policies and forms for downloading or printing that reduce risks in the workplace.

The following Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS+ Online representative. It's that simple.

Thank you for choosing Travelers Bond & Specialty Insurance for your insurance needs. Travelers is a market leader in providing management liability and crime coverages that are specifically customized for your organization.

<u>Instructions for Registration & Orientation to Risk Management PLUS+ Online®</u>

*Registration for Site Administrators:*
The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to  www.rmplusonline.com.
2. In the Sign-In box, click   **Register**.
3. Enter the password/passcode: TRVP110000
4. Fill in the Registration Information and click   **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*
1. Go to  www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on   **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.

This notice provides no coverage, nor does it change any policy terms. To determine the scope of coverage and the insured's rights and duties under the policy, read the entire policy carefully. For more information about the content of this notice, the insured should contact their agent or broker. If there is any conflict between the policy and this notice, the terms of the policy prevail.

**Independent Agent And Broker
Compensation Notice**

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html.

Or write or call:

**Travelers, Agency Compensation
P.O. Box 2950
Hartford, Connecticut 06104-2950**

**(866) 904.8348**

This notice provides no coverage, nor does it change any policy terms. To determine the scope of coverage and the insured's rights and duties under the policy, read the entire policy carefully. For more information about the content of this notice, the insured should contact their agent or broker. If there is any conflict between the policy and this notice, the terms of the policy prevail.

**Michigan Exempt
Commercial Policyholder Notice**

This policy is exempt from the filing requirements of Section 2236 of the insurance code of 1956, 1956 PA 218,MCL 500.2236.

© 2019 The Travelers Indemnity Company. All rights reserved.





*Declarations*

| | |
|---|---|
| **POLICY NO.** | 106328657 |

**Travelers Casualty and Surety Company of America**
**Hartford, Connecticut**
(A Stock Insurance Company, herein called the Company)

## LIABILITY COVERAGES, SEPARATE LIABILITY COVERAGES, AND THIRD PARTY LIABILITY INSURING AGREEMENTS ARE WRITTEN ON A CLAIMS-MADE BASIS AND COVER ONLY CLAIMS MADE AGAINST INSUREDS DURING THE POLICY PERIOD.

## THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.

**ITEM 1**   **NAMED INSURED/INSURANCE REPRESENTATIVE:**

Pitt, McGehee, Palmer, Bonanni & Rivers, PC

D/B/A:

Principal Address:
117 W. FOURTH ST., SUITE 200
ROYAL OAK, MI 48067

**ITEM 2**   **POLICY PERIOD:**

Inception Date: March 17, 2022          Expiration Date: March 17, 2023
12:01 A.M. local time both dates at the Principal Address stated in ITEM 1.

**ITEM 3**   **ADDRESS INFORMATION FOR NOTICES TO COMPANY:**

Email: BSIclaims@travelers.com
Fax: 1-888-460-6622

Mail: Travelers Bond & Specialty Insurance Claim
    P.O. Box 2989
    Hartford, CT 06104-2989

Overnight Mail: Travelers Bond & Specialty Insurance Claim
      One Tower Square, S202A
      Hartford, CT 06183

For questions related to claim reporting or handling, please call 1-800-842-8496.

**ITEM 4**   **COVERAGES INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**

© 2022 The Travelers Indemnity Company. All rights reserved.

Crime Coverages

Crime

**Cyber Coverage**

CyberRisk

---

**ITEM 5**

<div align="center">

**CRIME COVERAGES**

</div>

| CRIME |
|:---:|

| INSURING AGREEMENT | SINGLE LOSS LIMIT OF INSURANCE | SINGLE LOSS RETENTION |
|---|---|---|
| **A. Fidelity**<br>　1. Employee Theft<br>　2. ERISA Fidelity<br>　3. Employee Theft of Client Property | $1,000,000<br>$1,000,000<br>Not Covered | $5,000<br>$0 |
| **B. Forgery or Alteration** | $1,000,000 | $5,000 |
| **C. On Premises** | $1,000,000 | $5,000 |
| **D. In Transit** | $1,000,000 | $5,000 |
| **E. Money Orders and Counterfeit Money** | $1,000,000 | $5,000 |
| **F. Computer Crime**<br>　1. Computer Fraud<br>　2. Computer Program and Electronic Data Restoration Expense | $1,000,000<br>Not Covered | $5,000 |
| **G. Funds Transfer Fraud** | $1,000,000 | $5,000 |
| **H. Personal Accounts Protection**<br>　1. Personal Accounts Forgery or Alteration<br>　2. Identity Fraud Expense Reimbursement | $1,000,000<br>Not Covered | $5,000 |
| **I. Claim Expense** | $5,000 | $0 |

**Policy Aggregate Limit of Insurance:**     ☐ Applicable     ☒ Not Applicable

If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each **Policy Period** for Insuring Agreements A through H, inclusive, is:     Not Applicable

If a Policy Aggregate Limit of Insurance is not included, then this **Crime Policy** is not subject to a Policy Aggregate Limit of Insurance as set forth in section V. CONDITIONS, B.1.a.

**Cancellation of Prior Insurance:**

By acceptance of this **Crime Policy**, the **Insured** gives the Company notice canceling prior policies or bonds issued by the Company that are designated by policy or bond numbers  Not Applicable, such cancellation to be effective at the time this **Crime Policy** becomes effective.

**INSURED'S PREMISES COVERED:**

All Premises of the **Insured** in the United States of America, its territories and possessions, Canada, or any other country throughout the world, except:

---

Not Applicable

| CYBERRISK DECLARATIONS |
|---|

**CyberRisk Aggregate Limit:** $1,000,000

| Liability | Limit | Retention |
|---|---|---|
| Privacy and Security | $1,000,000 | $10,000 |
| Payment Card Costs | $1,000,000 | Subject to Privacy and Security Retention |
| Media | $1,000,000 | $10,000 |
| Regulatory Proceedings | $500,000 | $10,000 |

| Breach Response | Limit | Retention |
|---|---|---|
| Privacy Breach Notification | $500,000 | $10,000 |
| Computer and Legal Experts | $500,000 | $10,000 |
| Betterment | $100,000 | NA |
| Cyber Extortion | $500,000 | $10,000 |
| Data Restoration | $500,000 | $10,000 |
| Public Relations | $500,000 | $10,000 |

| Cyber Crime | Limit | Retention |
|---|---|---|
| Computer Fraud | NA | NA |
| Funds Transfer Fraud | NA | NA |
| Social Engineering Fraud | $100,000 | $5,000 |
| Telecom Fraud | $100,000 | $5,000 |

| Business Loss | Limit | Retention |
|---|---|---|
| Business Interruption | $500,000 | |
| Dependent Business Interruption | $500,000 | |
| Dependent Business Interruption - System Failure | $500,000 | |
| Dependent Business Interruption - Outsource Provider | $500,000 | |
| Dependent Business Interruption - Outsource Provider - System Failure | $500,000 | |
| Reputation Harm | $250,000 | $5,000 |

© 2022 The Travelers Indemnity Company. All rights reserved.

System Failure                              $500,000

**Additional First Party Provisions**

Accounting Costs Limit: $25,000

Betterment Coparticipation: 50%

Period Of Restoration: 180 days

Period Of Indemnity: 30 days

Wait Period: 8 hours

**Knowledge Date**: June 22, 2015

**P&P Date**: June 22, 2015

**Retro Date**: June 22, 2015

**Extended Reporting Period**

Months: 12

Percentage of Annualized Premium: 75 %

---

**ITEM 6**

**PREMIUM FOR THE POLICY PERIOD FOR ALL COVERAGES:**

$6,644.00          Policy Premium for all purchased Coverages

---

**ITEM 7**   **TYPE OF CLAIM DEFENSE FOR CYBER COVERAGE:**

☐          Reimbursement

☒          Duty-to-Defend

☐          Varies by Coverage - See Expanded Claim Defense Options Endorsement

Only the type of CLAIM DEFENSE marked "☒" is included in this policy.

---

**ITEM 8**   **EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

Additional Premium Percentage:   75 %
Additional Months:                       12

(If exercised in accordance with the applicable EXTENDED REPORTING PERIOD condition)

---

**ITEM 9**   **RUN-OFF EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

Additional Premium Percentage:   Not Applicable
Additional Months:                       Not Applicable

(If exercised in accordance with the applicable CHANGE OF CONTROL condition**)**

---

**ITEM 10**   **ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY FOR LIABILITY COVERAGES SUBJECT TO LIA-3001:**

---

ACF-2001 Rev. 02-22                                                                                    Page 4 of 5
© 2022 The Travelers Indemnity Company. All rights reserved.

☐ Applicable     ☒ Not Applicable

Only those coverage features marked " ☒ Applicable" are included in this policy.

| ITEM 11 | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE FOR ALL COVERAGES:** |
|---|---|

ACF-7007-0811; AFE-17007-0119; ACF-7006-0511; AFE-19029-0719; AFE-19030-0920; AFE-16001-0119; LIA-4012-0109; CRI-3001-0109; CRI-7059-0109; CRI-19002-0412; CRI-19060-0713; CRI-19072-0315; CRI-19101-1117; CRI-19115-0519; CRI-19085-0919; CRI-19122-1120; CRI-4009-0109; CRI-7027-0109; CRI-5023-0613; CRI-7026-0713; CYB-16001-TOC-0620; CYB-16001-0620; CYB-19105-0119; CYB-19123-0519; CYB-19122-0519; CYB-19102-0620; CYB-19104-0620; CYB-19119-0119; LIA-5022-1107

| ITEM 12 | **LIABILITY COVERAGE SHARED LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001): |
|---|---|

☐ Applicable     ☒ Not Applicable

N/A                          for all **Claims** under the following **Liability Coverages** that are subject to the Terms & Conditions in LIA-3001:

If the **Liability Coverages** selected in ITEM 12 are also **Scheduled Coverages** selected in ITEM 13, then the amount of the **Liability Coverage Shared Limit of Liability** set forth in ITEM 12 is part of, and not in addition to, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages** set forth in ITEM 13.

| ITEM 13 | **SHARED LIMIT OF LIABILITY/LIMIT OF INSURANCE FOR SCHEDULED COVERAGES:** |
|---|---|

☐ Applicable     ☒ Not Applicable

N/A                          for all **Claims** and limits of insurance under the following **Scheduled Coverages**:

The Company's maximum liability for the **Policy Period** for all **Claims** and limits of insurance under the **Scheduled Coverages** listed in ITEM 13 will not exceed the amount of the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**. Any Additional Defense Limit of Liability, Supplemental Personal Indemnification Limit of Liability, or Identity Fraud Expense Reimbursement Limit of Insurance is in addition to, and not part of, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**.

**PRODUCER INFORMATION:**

PROFESSIONAL CONCEPTS
1127 S OLD US 23
BRIGHTON, MI 48114

IN WITNESS WHEREOF, the Company has caused this policy/bond to be signed by its authorized officers.

President                                                      Corporate Secretary

© 2022 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CROSS-COVERAGE NOTICE ENDORSEMENT

This endorsement changes the following:

**Crime, CyberRisk**

---

**It is agreed that:**

Notice provided to the Company of any:

1. **Claim**, **Potential Claim**, **Settlement Program Notice**, or circumstances which may give rise to a **Claim** under any Management Coverage or **Liability Coverage**; or

2. loss or situation that may result in loss, **Insured Event**, or **Identity Fraud** under any Crime Coverage or Other Coverage;

shall be deemed to have been provided under the Policy in its entirety.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106328657**

© 2011 The Travelers Indemnity Company. All rights reserved.

This endorsement changes the Policy to comply with Michigan law.

**Michigan Changes Endorsement**

If this Policy is construed under the laws of the state of Michigan, the following applies:

**Requirement To Notify The Insurer.**

Notice by or on behalf of the *Insured* to the Insurer's authorized agent, with information sufficient to identify the *Insured*, is notice to the Insurer.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2019 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Crime, CyberRisk**

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106328657**

ACF-7006 Ed. 05-11                                                                                          Page 1 of 1
© 2011 The Travelers Indemnity Company. All rights reserved.

This endorsement modifies any Coverage Part or Coverage Form included in this Policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

**Cap On Losses From Certified Acts Of Terrorism Endorsement**

The following is added to this Policy. This provision can limit coverage for any loss arising out of a *Certified Act Of Terrorism* if such loss is otherwise covered by this Policy. This provision does not apply if and to the extent that coverage for the loss is excluded or limited by an exclusion or other coverage limitation for losses arising out of *Certified Acts Of Terrorism* in another endorsement to this policy.

If aggregate insured losses attributable to *Certified Acts Of Terrorism* exceed $100 billion in a calendar year and the Insurer has met its insurer deductible under *TRIA*, the Insurer will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

*Certified Act Of Terrorism* means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of *TRIA*, to be an act of terrorism pursuant to *TRIA*. The criteria contained in *TRIA* for a *Certified Act Of Terrorism* include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

*TRIA* means the federal Terrorism Risk Insurance Act of 2002 as amended.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2019 The Travelers Indemnity Company. All rights reserved.

This endorsement modifies any Coverage Part or
Coverage Form included in this Policy that is subject to
the federal Terrorism Risk Insurance Act of 2002 as
amended.

**Federal Terrorism Risk Insurance Act**
**Disclosure Endorsement**

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA"), establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is 80% of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA).

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is no more than one percent of your premium, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA. Please note that no separate additional premium charge has been made for coverage for Insured Losses covered by TRIA. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium.

This form contains terms that apply to the Policy.                                 **General Conditions**

**Authorization And Changes.**

The Named Insured will act on behalf of all *Insureds* regarding the payment of premium, receipt of return premium, change of coverage, and receipt of notices of cancelation or nonrenewal. Each *Insured* agrees that they have delegated such authority to the Named Insured.

The Named Insured may change this Policy with the Insurer's consent by endorsement to this Policy. No rights or duties under this policy may be transferred or assigned without the Insurer's written consent.

**Conformity To Law.**

Any part of this Policy that conflicts with applicable statutory or regulatory law is changed to conform to such law. This Policy provides coverage and benefits only to the extent that it does not expose the Insurer, or any of its subsidiaries, or affiliated companies, to a trade or economic sanction, prohibition, or restriction under a U.N. resolution, trade or economic sanction, or E.U., U.K., or U.S. law or regulation.

**Consent And Cooperation.**

Where the Insurer's consent is required, such consent will not be unreasonably withheld. The *Insured* agrees to give all information, assistance, and cooperation the Insurer reasonably requires.

**Representatives.**

In the event of an *Insured Person's* death, incapacity, or bankruptcy, this Policy will afford coverage to his or her:
1. estate;
2. legal representative;
3. legal spouse, domestic partner, or party to a civil union; or
4. assignee,

but only to the extent that it would have applied to such *Insured Person*.

**Suits Against The Insurer.**

No person or entity has the right under this Policy to join the Insurer as a party in an action against an *Insured* to determine such *Insured's* liability, nor may the Insurer be impleaded by any *Insured*. No action will lie against the Insurer unless there has been full compliance with all the terms of this Policy.

**Territory And Valuation.**

This Policy applies anywhere in the world, but it does not apply to *Loss* incurred by an *Insured* residing or domiciled in a country or jurisdiction in which the Insurer is not licensed to provide this insurance, to the extent that providing this insurance would violate any applicable foreign law or regulation ("Foreign Loss").

If an *Insured Entity* incurs Foreign Loss, the Insurer will reimburse the Named Insured for such Foreign Loss because of the Named Insured's financial interest in such *Insured Entity*. If an *Insured Person* incurs Foreign Loss not indemnified by an *Insured Entity*, such Foreign Loss will be paid in a country or jurisdiction mutually acceptable to such *Insured Person* and the Insurer, to the extent that doing so would not violate any applicable foreign law or regulation.

All amounts in this Policy are stated in U.S. Dollars. If amounts are due under a liability coverage and are stated in a different currency, payment will be made in U.S. Dollars at the exchange rate published in The Wall Street Journal at the time the final amount is determined.

**Titles, Headings, And Defined Terms.**

The titles and headings in this Policy do not affect coverage. Where appearing in this Policy, in singular or plural, words and phrases appearing in italicized type have the meaning shown in the Definitions of the applicable Coverage.

© 2019 The Travelers Indemnity Company. All rights reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## MICHIGAN CHANGES ENDORSEMENT

This endorsement modifies the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

1.  **Section III. CONDITIONS, F. INSURED'S DUTIES IN THE EVENT OF A CLAIM** is amended by the addition of the following sentence to the first paragraph:

    Notice given by or on behalf of the **Insured** to the Company's authorized agent, with particulars sufficient to identify the **Insured,** will be considered notice to the Company.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**



**CRIME**

### CRIME TERMS AND CONDITIONS

### PLEASE READ ALL TERMS AND CONDITIONS CAREFULLY

**CONSIDERATION CLAUSE**

**IN CONSIDERATION** of the payment of the premium stated in the Declarations, and subject to the Declarations and pursuant to all the terms, conditions, exclusions and limitations of this **Crime Policy**, the Company will pay the **Insured** for direct loss that the **Insured** sustains which is directly caused by a **Single Loss** taking place at any time and which is **Discovered** by the **Insured** during the **Policy Period** or during the Extended Period to Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss.

---

### I.    INSURING AGREEMENTS

---

This **Crime Policy** provides coverage under each of the following Insuring Agreements. Notwithstanding the aforesaid, if ITEM 5 of the Declarations indicates that any Insuring Agreement is "*Not Covered,*" then such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.

    **A.    FIDELITY**

        1.    Employee Theft

        The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

        2.    ERISA Fidelity

        The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by **Theft** or **Forgery** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

        3.    Employee Theft of Client Property

        The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** sustained by the **Insured's Client**, directly caused by **Theft** or **Forgery** committed by an identified **Employee**.

    **B.    FORGERY OR ALTERATION**

    The Company will:

        1.    pay the **Insured** for the **Insured's** direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

---

©2009 The Travelers Companies, Inc. All Rights Reserved

a. made by, drawn by, or drawn upon, the **Insured**, or purport to have been so made or drawn; or

b. made or drawn by one acting as the **Insured's** agent, or purport to have been so made or drawn; and

2. reimburse the **Insured** for reasonable legal defense expenses that the **Insured** has paid if the **Insured** is sued for refusing to pay any written **Covered Instrument** under this Insuring Agreement B. on the basis that it has been **Forged** or altered. Reimbursement of such legal expenses is conditioned upon the **Insured's** receipt of the Company's prior written consent to defend against such suit. The amount of any legal expenses reimbursed under Insuring Agreement B. is in addition to the applicable Single Loss Limit of Insurance for Insuring Agreement B.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer is treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement B.

For purposes of this Insuring Agreement B., the term "check" includes a "substitute check" as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

**C.    ON PREMISES**

The Company will pay the **Insured** for:

1. the **Insured's** direct loss of **Money** or **Securities** located inside the **Premises** or **Financial Institution Premises** directly caused by **Theft**, committed by a person present inside such **Premises** or **Financial Institution Premises**;

2. the **Insured's** direct loss of **Money** or **Securities** located inside the **Premises** or **Financial Institution Premises** directly caused by disappearance, damage or destruction;

3. the **Insured's** direct loss of, or direct loss from damage to, **Other Property** located inside the **Premises**:
   a. directly caused by an actual or attempted **Robbery**; or
   b. in a safe or vault, directly caused by an actual or attempted **Safe Burglary**; and

4. the **Insured's** direct loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if the **Insured** is the owner of the **Premises** or is liable for damage to it; or

5. the **Insured's** direct loss of, or loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if the **Insured** is the owner of the locked safe, vault, cash register, cash box or cash drawer or is liable for damage thereto.

**D.    IN TRANSIT**

1. The Company will pay the **Insured** for the **Insured's** direct loss of **Money** or **Securities** directly caused by **Theft**, disappearance, damage or destruction while in transit outside the **Premises** and in the care and custody of:

a. **a Messenger**, including while temporarily within the living quarters of a **Messenger**; or

b. an armored motor vehicle company.

2. The Company will pay the **Insured** for the **Insured's** direct loss of, or the **Insured's** direct loss from damage to, the **Insured's Other Property** directly caused by an actual or attempted **Robbery** while in transit outside the **Premises** and in the care and custody of:

a. **a Messenger**; or

b. an armored motor vehicle company.

3. The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, the **Insured's Other Property** directly caused by an actual or attempted **Theft** of the **Insured's Other Property** while it is temporarily within the living quarters of a **Messenger**.

Coverage under this Insuring Agreement D. begins immediately upon receipt of the **Money**, **Securities** or **Other Property** by the transporting party and ends immediately upon delivery to the designated recipient or its agent.

E.   **MONEY ORDERS AND COUNTERFEIT MONEY**

The Company will pay the **Insured** for the **Insured's** direct loss directly caused by the **Insured's** good faith acceptance of:

1. original money orders, issued or purportedly issued by any post office, express company or bank located in the United States of America, its territories and possessions, Canada, or any other country in which the **Insured** maintains a physical **Premises**, that are not paid upon presentation; or

2. **Counterfeit Money**, of the United States of America, its territories and possessions, Canada, or any other country in which the **Insured** maintains a physical **Premises** that is acquired during the regular course of business;

in exchange for merchandise, **Money** or services.

F.   **COMPUTER CRIME**

1. Computer Fraud

The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Computer Fraud**.

2. Computer Program and Electronic Data Restoration Expense

The Company will pay the **Insured** for reasonable **Restoration Expense** that the **Insured** incurs to restore or replace damaged or destroyed **Computer Programs** or **Electronic Data** stored within the **Insured's Computer System** directly caused by a **Computer Violation**.

For purposes of this Insuring Agreement F.2., a **Single Loss** involving **Computer Program** and **Electronic Data Restoration Expense** applies to reasonable **Restoration Expense** incurred by the **Insured** between the time the **Insured Discovers** the damage or destruction and the time the

**Insured's Computer Program** or **Electronic Data** is restored to the level of operational capability that existed immediately preceding a **Computer Violation**. Recurrence of the same **Computer Virus** after the **Insured's Computer Program** or **Electronic Data** has been restored constitutes a separate **Single Loss**.

Payment of reasonable **Restoration Expense** applies:

a. only to **Computer Programs** and **Electronic Data** which the **Insured** owns or leases, or for which the **Insured** is legally liable; and

b. only if the **Insured** is unable to reproduce such **Computer Programs** or **Electronic Data** from back-up data copies.

Payment of reasonable **Restoration Expense** will be made to the **Insured** upon the completion of the restoration of the damaged or destroyed **Computer Programs** or **Electronic Data**.

If a **Single Loss** is covered under both Insuring Agreements F.1. and F.2., then only the Retention for a **Single Loss** under Insuring Agreement F.1. will be applicable and the payment of **Restoration Expense** under Insuring Agreement F.2. will be part of, and not in addition to, the Single Loss Limit of Insurance for Insuring Agreement F.1.

**G. FUNDS TRANSFER FRAUD**

The Company will pay the **Insured** for the **Insured's** direct loss of **Money** and **Securities** contained in the **Insured's Transfer Account** directly caused by **Funds Transfer Fraud**.

**H. PERSONAL ACCOUNTS PROTECTION**

1. Personal Accounts Forgery or Alteration

The Company will pay the **Insured**, on behalf of the **Insured's Management Staff Member**, for loss incurred by the **Insured's Management Staff Member**, directly caused by **Forgery** or alteration of, on or in any written **Covered Personal Instruments** that are:

a. drawn upon personal accounts of the **Insured's Management Staff Member**, or purported to have been so drawn; or

b. made or drawn by one acting as an agent of the **Insured's Management Staff Member**, or purport to have been so made or drawn.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer will be treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement H.

For purposes of this Insuring Agreement H.1. the term "check" includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

2. Identity Fraud Expense Reimbursement

The Company will reimburse the **Insured**, on behalf of the **Insured's Management Staff Member**, for **Identity Fraud Expense** incurred by the **Insured's Management Staff Member** as a direct result of any **Identity Fraud**.

©2009 The Travelers Companies, Inc. All Rights Reserved

I.      **CLAIM EXPENSE**

The Company will pay the **Insured** for reasonable **Claim Expenses** incurred and paid by the **Insured** to establish the existence, amount and preparation of the **Insured's** proof of loss in support of a covered claim for loss under any Insuring Agreement of this **Crime Policy**.

The following conditions specifically apply to this Insuring Agreement I.:

1.      any **Claim Expenses** payable to the **Insured** are only applicable to any covered loss which exceeds the Single Loss Retention for the Insuring Agreement that is the subject of a claim under this **Crime Policy**;

2.      **Claim Expenses** that are payable to the **Insured** are in addition to the Single Loss Limit of Insurance for the Insuring Agreement that is the subject of a claim under this **Crime Policy**; and

3.      **Claim Expenses** payable to the **Insured** will be paid to the **Insured** at the same time as the payment of the valid and collectible loss under the Insuring Agreement that is the subject of a claim under this **Crime Policy**.

II.     *GENERAL AGREEMENTS*

A.      **JOINT INSURED**

1.      If the **Insured** consists of more than one entity, then the **First Named Insured** acts for itself and for every other **Insured** for all purposes of this **Crime Policy**.

2.      If any **Insured**, or a partner or **Management Staff Member** of that **Insured**, has knowledge of any information relevant to this **Crime Policy**, that knowledge is considered knowledge of every **Insured**.

3.      An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

4.      The Company will not pay the **Insured** more for loss or losses sustained by more than one **Insured** than the amount the Company would pay if all loss or losses had been sustained by one **Insured**.

5.      Payment by the Company to the **First Named Insured** for loss sustained by any **Insured**, or payment by the Company to the **Employee Benefit Plan** for loss sustained under Insuring Agreement A.2, fully releases the Company on account of such loss.

6.      If this **Crime Policy** or any of its Insuring Agreements are canceled or terminated as to any **Insured**, loss sustained by that **Insured** is covered only if **Discovered** by the **Insured** during the period of time provided in the Extended Period To Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss; provided, this extended period to discover loss terminates as to that **Insured** immediately upon the effective date of any other insurance obtained by that **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

B.      **ADDITIONAL OFFICES**

If the **Insured** establishes any additional offices, other than by consolidation with, merger with, purchase of, or acquisition of assets or liabilities of another organization while this **Crime Policy** is in effect, such offices are automatically covered by this **Crime Policy** from the date of such establishment without the requirement of notice to the Company or the payment of additional premium for the remainder of the **Policy Period**.

C.     **CONSOLIDATION, MERGER OR PURCHASE OF ASSETS**

If, during the **Policy Period**, the **Insured** merges with, purchases or acquires the assets or liabilities of another entity, this **Crime Policy** will provide coverage for that merged, purchased, or acquired entity, subject to all other terms and conditions herein, but only for loss **Discovered** by the **Insured** after the effective date of such merger, purchase, or acquisition; provided, the **Insured** gives the Company written notice of such merger, purchase, or acquisition, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such merger, purchase, or acquisition. Coverage for the merged, purchased, or acquired entity will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insured** has paid the Company any additional premium as may be required by the Company. Any **Employee Benefit Plan** or **Sponsored Plan** acquired as above will be included as **Insureds** as specified in Item 1 of the Declarations.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided: (1) the assets of the merged, purchased, or acquired entity do not exceed 30% of the total assets of all **Insureds** as reflected in the **Insured's** most recent fiscal year-end financial statement, or (2) the merger, purchase, or acquisition occurs less than 90 days prior to the end of the **Policy Period**.

D.     **ACQUISITIONS**

If, during the **Policy Period**, the **Insured** acquires a **Subsidiary**, this **Crime Policy** will provide coverage for such **Subsidiary** and its respective **Management Staff Members**, **Employee Benefit Plans**, and **Sponsored Plans**, subject to all other terms and conditions of this **Crime Policy**, provided written notice of such acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such acquisition.  Coverage for such **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired **Subsidiary** do not exceed 30% of the **Insured's** total assets as reflected in the **Insured's** most recent fiscal year-end financial statement; or (2) the acquisition occurs less than 90 days prior to the end of the **Policy Period**.

E.     **CHANGE OF CONTROL – NOTICE REQUIREMENTS**

When the **Insured** learns that a **Change of Control** has taken place as to any **Insured**, or will take place during the **Policy Period**, the **Insured** must give the Company written notice within 90 days of the effective date of such **Change of Control**.

*III.*     *DEFINITIONS*

Wherever appearing in this **Crime Policy**, the following words and phrases appearing in bold type have the meanings set forth in this Section III. DEFINITIONS:

A.     *Change of Control* means:

1.     the acquisition of any **Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of any **Insured** into or with another entity such that the **Insured** is not the surviving entity; or

2.     the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate more than 50% of the board of directors or board of managers or to exercise a majority control of the board of directors, board of managers, or a functional equivalent thereof of any **Insured**.

B.   **Claim Expenses** means reasonable fees, costs and expenses of outside accountants, attorneys, consultants or experts retained by the **Insured** to determine the amount and extent of loss covered under this **Crime Policy**. The reasonableness of such expenses will be determined by the Company. The phrase does not mean or include any of the **Insured's** internal corporate fees, costs (direct or indirect), obligations or **Employee** wages and salaries.

C.   **Client** means an entity designated as a **Client** by endorsement to this **Crime Policy** for which the **Insured** performs services as specified in a written agreement, but only while the written agreement is in effect.

D.   **Client's Premises** means the interior of that portion of any building the **Insured's Client** occupies in conducting its business.

E.   **Computer Fraud** means:

The use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property** from inside the **Premises** or **Financial Institution Premises**:

   1.   to a person (other than a **Messenger**) outside the **Premises** or **Financial Institution Premises**; or
   2.   to a place outside the **Premises** or **Financial Institution Premises**.

F.   **Computer Program** means a set of related electronic instructions that direct the operations and functions of a **Computer System** or devices connected to it that enable the **Computer System** or devices to receive, process, store, retrieve, send, create or otherwise act upon **Electronic Data**.

G.   **Computer System** means a computer and all input, output, processing, storage and communication facilities and equipment that are connected to such a device and that the operating system or application software used by the **Insured** are under the direct operational control of the **Insured**. Off-line media libraries are deemed to be part of such **Computer System**.

H.   **Computer Violation** means:

   1.   a **Computer Virus** designed to damage or destroy a **Computer Program** or **Electronic Data**; or
   2.   vandalism by a natural person, including an **Employee**, who has gained unauthorized electronic access to the **Insured's Computer System**.

I.   **Computer Virus** means a set of unauthorized instructions, programmatic or otherwise:

   1.   directed solely against the **Insured**; and
   2.   that propagate themselves through the **Computer System** or networks;

provided such instructions were maliciously introduced by a natural person.

J.   **Counterfeit** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

K.   **Covered Instruments** means:

   1.   checks, drafts, promissory notes, bills of exchange or similar written promises, orders or directions to pay a sum certain in **Money**; and
   2.   written instruments required in conjunction with any transaction involving any **Credit, Debit or Charge Card** issued to the **Insured**, the **Insured's Employees** or the **Insured's Management Staff Members** for business purposes.

L.   **Covered Personal Instruments** means:

   1.   checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in **Money**; and

©2009 The Travelers Companies, Inc. All Rights Reserved

2.    written instruments required in conjunction with any transaction involving any **Credit, Debit or Charge Card** issued to a **Management Staff Member** for personal use.

M.    ***Credit, Debit or Charge Card*** means any card, plate or other similar device used for the purpose of obtaining **Money**, property, labor or services on credit or for immediate payment. The terms do not mean a note, check, draft, money order or other negotiable instrument.

N.    ***Crime Policy*** means, collectively, the Declarations, the application, the Crime Terms and Conditions, and any endorsements attached thereto.

O.    ***Digital Signature*** means an electronic identifier created by computer, within, attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.

P.    ***Discover, Discovered,*** or ***Discovery*** means the moment when the **Insured**, any partner in the **Insured**, or **Management Staff Member**:

1.    first become(s) aware of facts that would cause a reasonable person to assume that a loss of a type covered by this **Crime Policy** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact details of loss may not then be known; or

2.    first receive(s) notice of a claim against the **Insured** alleging facts which, if true, would constitute a loss under this **Crime Policy**,

whichever occurs first.

Q.    ***Electronic Data*** means facts or information converted to a form:

1.    usable in a **Computer System**;

2.    that does not provide instructions or directions to a **Computer System**; or

3.    that is stored on electronic processing media for use by a **Computer Program**.

R.    ***Electronic Signature*** means a **Digital Signature**, an electronic sound, symbol or process, within, attached to, or logically associated with a record and executed or adopted by a person with the intent to sign the record.

S.    ***Employee*** means:

1.    any natural person:

a.    while in the **Insured's** service or for 60 days after termination of service, unless such termination is due to **Theft** or **Forgery** or any other dishonest act committed by the **Employee**;

b.    who the **Insured** compensates directly by salary, wages or commissions; and

c.    who the **Insured** has the right to direct and control while performing services for the **Insured**;

2.    any natural person who is temporarily furnished to the **Insured**:

a.    to substitute for an **Employee** as set forth in paragraph 1. above, who is on medical, military or other leave of absence; or

b.    to meet seasonal or short-term workload conditions;

while that person is subject to the **Insured's** direction and control and performing services for the **Insured**; provided, any such natural person who has care and custody of property outside the **Premises** is specifically excluded from this definition;

3.      any natural person, other than a temporary **Employee** described in paragraph 2. above, who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

4.      any natural person:

    a.      who is a member of the board of directors, member of the board of trustees or **LLC Manager** while acting as a member of any of the **Insured's** elected or appointed committees, including any member of such committee, to perform on the **Insured's** behalf, specific, as distinguished from general, directorial acts;

    b.      who is a non-compensated officer;

    c.      other than a non-compensated fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee** or officer;

    d.      while acting as a non-compensated fund solicitor during fund raising campaigns;

    e.      who is a former **Employee**, member of the board of directors, partner, **LLC Manager**, or member of the board of trustees retained as a consultant while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

    f.      who is a guest student or intern pursuing studies or duties in any of the **Insured's** offices or **Premises**; while such person is subject to the **Insured's** direction and control and performing services for the **Insured**;

    g.      who is a volunteer, while such person is subject to the **Insured's** direction and control and is performing services for the **Insured**, or

5.      any attorney retained by the **Insured**, and any employee of such attorney, while performing legal services for the **Insured**.

*Employee* also means any individual described in paragraphs 1-5 above while such person is on medical, military, or other leave of absence from the **Insured**. Coverage applies to any such **Employee** while on leave, regardless of whether such person remains subject to the **Insured's** direction and control during the time of leave.

*Employee* does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative or other person of the same general character not specified in paragraphs 1. through 5. above.

T.    *Employee Benefit Plan* means an employee welfare benefit plan or an employee pension benefit plan as more fully set forth in Title 1, Section 3 of the Employee Retirement Income Security Act of 1974 and any amendments thereto (ERISA) and which is solely sponsored by an **Employee Benefit Plan Sponsor**.

U.    **Employee Benefit Plan Sponsor** means:

1.      the **First Named Insured**,

2.      any **Subsidiary**, or

3.      any other entity listed in Item 1. of the Declarations.

V.   **Fiduciary** means any natural person who is a trustee, an officer, an **Employee** or an administrator of any **Employee Benefit Plan**; and any person, or a member of the board of directors, an officer, an **Officer-Shareholder**, a member of the board of trustees, an **LLC Manager**, or an **Employee** while that person is handling **Money**, **Securities** and **Other Property** that belongs to any **Employee Benefit Plan**.

**Fiduciary** does not mean any agent, broker, independent contractor, broker/dealer, registered representative, investment advisor, custodian or other person or entity of the same general character.

W.   **Financial Institution** means:
   1.   a bank, trust company, savings bank, credit union, savings and loan association or similar thrift institution; or
   2.   a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution.

X.   **Financial Institution Premises** means the interior of that portion of any building occupied by a **Financial Institution** (including any night depository chute and any safe maintained by such **Financial Institution**), transfer agent or registrar or similarly recognized place of safe deposit.

Y.   **First Named Insured** means the entity first named in ITEM 1 of the Declarations.

Z.   **Forgery**, or **Forged** means the signing of the name of another person or organization with a handwritten signature physically affixed directly to a **Covered Instrument** or **Covered Personal Instrument**, without authority and with the intent to deceive; it does not mean a signature that consists in whole or in part of one's own name signed with or without authority in any capacity, for any purpose.

AA.   **Funds Transfer Fraud** means:

   1.   an electronic, telegraphic, cable, teletype or telephone instruction fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from the **Transfer Account** which instruction purports to have been transmitted by the **Insured**, but was in fact fraudulently transmitted by someone other than the **Insured** without the **Insured's** knowledge or consent;
   2.   a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a **Financial Institution** directing such **Financial Institution** to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the **Insured** but was in fact fraudulently issued, **Forged** or altered by someone other than the **Insured** without the **Insured's** knowledge or consent; or
   3.   an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured**, which purports to have been transmitted by an **Employee**, but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** consent.

BB.   **Identity Fraud** means the act of knowingly transferring or using, without lawful authority, a means of identification of a **Management Staff Member** with the intent to commit, aid, or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable jurisdiction.

CC.   **Identity Fraud Expense** means:

   1.   costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;

   2.   costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

---

3.      costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;

4.      lost wages, up to a maximum payment of $1,000. per week for a maximum period of five (5) weeks, as a result of absence from employment:

     a.      to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;

     b.      to complete fraud affidavits or similar documents; or

     c.      due to wrongful incarceration arising solely from someone having committed a crime in the **Management Staff Member's** name; provided, that lost wages will not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

5.      loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

6.      reasonable attorney fees incurred, with the Company's prior written consent, for:

     a.      defense of lawsuits brought against the **Insured's Management Staff Member** by financial institutions, merchants, other credit grantors or their collection agencies;

     b.      the removal of any criminal or civil judgments wrongly entered against the **Insured's Management Staff Member**; or

     c.      challenging the accuracy or completeness of any information in a consumer credit report; and

7.      costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

*Identity Fraud Expense* does not include any expense or loss not listed in paragraphs 1. through 7. of this Definition CC..

DD.      *Insured* means:

1.      for the purposes of Insuring Agreement A.2., any and all **Employee Benefit Plans**;

     a.      which have been established or maintained by an **Employee Benefit Plan Sponsor** as of the inception date of this **Crime Policy**, or

     b.      which have been created or acquired by an **Employee Benefit Plan Sponsor** after the inception date of this **Crime Policy**, subject to the provisions of General Agreements C and D.

or

2.      for the purposes of all other Insuring Agreements:

     a.      the **First Named Insured**,

     b.      any **Subsidiary**,

     c.      any **Sponsored Plan,** or

     d.      any other entity listed in Item 1. of the Declarations.

EE.      *LLC Manager* means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of a limited liability company.

FF.      *LLC Member* means any natural person who has an ownership interest in a limited liability company.

GG. **Management Staff Member** means the **Insured's** proprietor, natural person partner, member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel, **LLC Manager**, or **LLC Member**.

HH. **Messenger** means any **Management Staff Member**, or relative thereof, any **Officer-Shareholder**, or any **Employee**, duly authorized, while having care and custody of covered property outside the **Premises**.

II. **Money** means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

JJ. **Officer-Shareholder** means any officer who has a 25% or greater ownership interest in any one or more **Insureds**.

KK. **Other Property** means any tangible property other than **Money** and **Securities** that has intrinsic value.

LL. **Policy Period** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations. In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Crime Policy**.

MM. **Premises** means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

NN. **Restoration Expense** means reasonable costs incurred by the **Insured** to reproduce **Computer Programs** or **Electronic Data** and enable the **Insured** to restore the **Insured's Computer System** to the level of operational capability that existed immediately preceding a **Computer Violation**.

   **Restoration Expense** does not include:

   1. the **Insured's** internal corporate costs and expenses, including **Employee** remuneration and any costs related to any legal action;
   2. expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** recorded on media, including magnetic or optical media if there are no analyses files, specifications or backups of **Computer Programs** or **Electronic Data** held outside the **Premises**;
   3. expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** if the **Insured** knowingly used illegal copies of programs;
   4. expenses incurred to render the **Computer Programs** and **Electronic Data** usable by replacement processing equipment;
   5. expenses incurred to design, update or improve **Computer Programs** or **Electronic Data** or to perfect their operation or performance;
   6. expenses incurred as a result of alteration in **Computer Programs** and **Electronic Data** held on magnetic media due to the effect of magnetic fields, incorrect usage of the **Computer Programs** and **Electronic Data**, or the obsolescence of the **Computer System**;
   7. the **Insured's** lost revenue, sales or profits; or
   8. expenses incurred by any customer.

OO. **Robbery** means the unlawful taking of **Money**, **Securities** and **Other Property** from the care and custody of the **Insured**, the **Insured's** partners or any other person (except any person acting as a watchperson or janitor) by one who has:
   1. caused or threatened to cause that person bodily harm; or
   2. committed an unlawful act witnessed by that person.

PP. **Safe Burglary** means the unlawful taking of:
   1. **Money**, **Securities** and **Other Property** from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

2.      a safe or vault from inside the **Premises**.

QQ.    ***Securities*** means written negotiable and non-negotiable instruments or contracts representing **Money** or property including:

1.      tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2.      evidences of debt issued in connection with any **Credit**, **Debit or Charge Card**, which cards are not issued by the **Insured**;

but does not include **Money**.

RR.    ***Single Loss*** means:

1.      for purposes of Insuring Agreement A.:

a.      an individual act;

b.      the combined total of all separate acts; or

c.      a series of related acts;

committed by an **Employee** or committed by more than one **Employee** acting alone or in collusion with other persons both during and before the **Policy Period**;

2.      for purposes of Insuring Agreements B. and H.1., all loss caused by any person, or loss in which that person is involved, whether the loss involves one or more written **Covered Instruments** or **Covered Personal Instruments**; and

3.      for purposes of all other Insuring Agreements:

a.      any act or series of related acts or events involving one or more persons;  or

b.      any act, acts or events involving a person or group of persons acting together;

whether identified or not, both during and before the **Policy Period**.

SS.    ***Sponsored Plan*** means any employee benefit plan or employee pension benefit plan solely sponsored by any **Insured** that is not subject to the terms of ERISA.

TT.    ***Subsidiary*** means:

1.      any corporation, partnership, limited liability company or other entity, organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint, or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent; or

2.      subject to the provisions set forth in Section II. GENERAL AGREEMENTS D. ACQUISITIONS, of the Crime Terms and Conditions, any entity that the **Insured** acquires or forms during the **Policy Period** in which the **Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent.

***Subsidiary*** does not include any entity in which any **Insured** is engaged as a participant in any type of joint venture unless such entity is specifically scheduled as an additional **Insured** by endorsement to this **Crime Policy**.

UU.    ***Theft*** means:

1.  under Insuring Agreement A.3., the intentional unlawful taking of **Money**, **Securities** and **Other Property** to the deprivation of a **Client**;

2.  under Insuring Agreements C. or D., the intentional unlawful taking of **Money** and **Securities** to the **Insured's** deprivation.

3.  under all other Insuring Agreements, the intentional unlawful taking of **Money**, **Securities** and **Other Property** to the **Insured's** deprivation.

VV.  ***Transfer Account*** means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** can initiate the transfer, payment or delivery of **Money** or **Securities**:

1.  by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

2.  by means of written instructions (other than those described in Insuring Agreements B. and H.1.) establishing the conditions under which such transfers are to be initiated by such **Financial Institution** through an electronic funds transfer system.

## IV.   EXCLUSIONS

A.  This **Crime Policy** will not apply to loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing.

B.  This **Crime Policy** will not apply to loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority.

C.  This **Crime Policy** will not apply to loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by the **Insured**, the **Insured's** natural person partners, any **LLC Member** or **Officer-Shareholder**, whether acting alone or in collusion with others; provided, this Exclusion C. will not apply to loss covered under Insuring Agreement A.2..

D.  This **Crime Policy** will not apply to loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by any **Employee** or **Fiduciary** whether acting alone or in collusion with others, unless covered under Insuring Agreements A.1., A.2., A.3., F.2., or H..

E.  This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Funds Transfer Fraud**, unless covered under Insuring Agreements A.1., A.2., A.3., or G..

F.  This **Crime Policy** will not apply to loss resulting directly or indirectly from the **Insured's** acceptance of money orders or **Counterfeit Money**, unless covered under Insuring Agreements A.1., A.2., A.3. or E..

G.  This **Crime Policy** will not apply to loss or damages resulting directly or indirectly from the input of **Electronic Data** by a natural person having the authority to enter the **Insured's Computer System**, unless covered under Insuring Agreements A.1., A.2., A.3., F.2. or G..

H.  This **Crime Policy** will not apply to loss resulting directly or indirectly from forged, altered or fraudulent documents or written instruments used as source documentation in the preparation of **Electronic Data**, unless covered under Insuring Agreements A.1., A.2., or A.3..

I.  This **Crime Policy** will not apply to any expenses incurred by the **Insured** in establishing the existence or the amount of any loss covered under this **Crime Policy**, unless covered under Insuring Agreement I..

J.  This **Crime Policy** will not apply to loss of income, whether or not earned or accrued, or potential income, including interest and dividends, not realized by the **Insured** as the result of any loss covered under this **Crime Policy**.

K.  This **Crime Policy** will not apply to damages of any type, except the **Insured's** direct compensatory damages resulting from a loss covered under this **Crime Policy**.

L.   This **Crime Policy** will not apply to indirect or consequential loss of any nature, including fines, penalties, multiple or punitive damages.

M.   This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Theft**, disappearance, damage, destruction or disclosure of any intangible property or confidential information including:

    1.   trade secret information, confidential processing methods or other confidential information or intellectual property of any kind, or **Electronic Data** unless otherwise covered under Insuring Agreement F.2.; or

    2.   **Computer Programs**.

N.   This **Crime Policy** will not apply to loss of, or damage to, manuscripts, records, accounts, microfilm, tapes or other records, whether written or electronic, or the cost of reproducing any information contained in such lost or damaged records, except when covered under Insuring Agreements C., D., or F.2..

O.   This **Crime Policy** will not apply to loss, or that part of any loss, the proof of which as to its existence or amount is dependent solely upon:

    1.   an inventory computation or physical count; or

    2.   a profit and loss computation;

provided that where the  **Insured** establishes wholly apart from such computations or physical count that the **Insured** has sustained a loss covered under Insuring Agreements A.1., A.2, A.3. or F.1., then the **Insured** may offer the **Insured's** inventory records and an actual physical count of inventory in support of other evidence as to the amount of loss claimed.

P.   This **Crime Policy** will not apply to loss resulting directly or indirectly from trading whether or not in the name of the **Insured** or whether or not in a genuine or fictitious account, unless covered under Insuring Agreement A.1, A.2. or A.3..

Q.   This **Crime Policy** will not apply to loss resulting directly or indirectly from fire, except:

    1.   loss of or damage to **Money** or **Securities**; or

    2.   damage to any safe or vault caused by the application of fire thereto in connection with any actual or attempted **Safe Burglary** when covered under Insuring Agreement C..

R.   This **Crime Policy** will not apply to loss resulting directly or indirectly from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase, whether or not fraudulent, with any other party not in collusion with an **Employee**, except when covered under Insuring Agreement E..

S.   This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** while in the custody of any **Financial Institution**, trust company, or similarly recognized place of safe deposit or armored motor vehicle company unless the loss is in excess of the amount recovered or received by the **Insured** under the **Insured's** contract, if any, with, or insurance carried by, any of the aforementioned.

T.   This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** held by an armored motor vehicle company for the **Insured**, and which is stored by such company overnight inside buildings used in the conduct of its business.

U.   This **Crime Policy** will not apply to loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident.

V.   This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** resulting directly or indirectly from kidnap, extortion or ransom payments (other than **Robbery**) surrendered to any person as a result of a threat.

W.   This **Crime Policy** will not apply to loss resulting directly or indirectly from **Forgery** or alteration, except when covered under Insuring Agreements A.1., A.2., A.3., B., or H..

X.   This **Crime Policy** will not apply to loss resulting directly or indirectly from **Computer Fraud**, except when covered under Insuring Agreements A.1., A.2., A.3., F.1., or H.1..

Y.   This **Crime Policy** will not apply to loss under Insuring Agreements C. or D. resulting directly or indirectly from:

    1.   an accounting or arithmetical error or omission;

    2.   the loss of property from within any money operated device, unless the amount of **Money** deposited in it is recorded by a continuous recording device;

    3.   anyone, acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property;

    4.   damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them; or

    5.   damage to the **Premises** or its exterior or to containers of covered property by vandalism or malicious mischief.

Z.   This **Crime Policy** will not apply to loss resulting directly or indirectly from the diminution in value of **Money**, **Securities** or **Other Property**.

AA.   This **Crime Policy** will not apply to loss arising from any **Credit**, **Debit or Charge Card** if the **Insured**, the **Insured's Employee** or **Management Staff Member** has not fully complied with the provisions, conditions or other terms under which any card was issued.

BB.   This **Crime Policy** will not apply to loss sustained by any **Subsidiary** or related **Employee Benefit Plan** or **Sponsored Plan**, occurring at any time during which such entity was not a **Subsidiary** or related **Employee Benefit Plan** or **Sponsored Plan**.

CC.   This **Crime Policy** will not apply to loss sustained by the **Insured** or any **Subsidiary** to the extent it results in a benefit, gain or transfer to the **Insured** or any **Subsidiary**, except to the extent that such loss is covered under Insuring Agreement A.2..

## *V.*   *CONDITIONS*

## A.   GENERAL CONDITIONS

1.   Territory Covered

Except as indicated in Item 5. of the Declarations,

    a.   the Company will cover loss the **Insured** sustains anywhere in the world, and

    b.   the Company will cover all of the **Insured's** offices and **Premises**, including any additional offices or **Premises** pursuant to Sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this **Crime Policy**.

2.   Cooperation

The **Insured** must cooperate with the Company in all matters pertaining to this **Crime Policy** as stated in its terms, conditions and limitations.

3.   Extended Period to Discover Loss

The Company will pay the **Insured** for loss that the **Insured** sustained prior to the effective date of cancellation or termination of this **Crime Policy**, which is **Discovered** by the **Insured**:

    a.   no later than 90 days from the date of cancellation or termination; and

    b.   as respects any **Employee Benefit Plan**, no later than one (1) year from the date of cancellation or termination.

Notwithstanding the above, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

4.      Other Insurance

This **Crime Policy** applies only as excess insurance over, and will not contribute with: (1) any other valid and collectible insurance available to any **Insured** unless such insurance is written specifically excess of this **Crime Policy** by reference in such other policy to the Policy Number of this **Crime Policy**; and (2) indemnification to which any **Insured** is entitled from any other entity other than any **Insured**. As excess insurance, this **Crime Policy** will not apply or contribute to the payment of any loss to the **Insured** until the amount of such other insurance or indemnity has been exhausted by loss covered thereunder. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this **Crime Policy** will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity. This **Crime Policy** will not be subject to the terms of any other insurance.

Any loss that is applicable to this Condition A.4. is subject to both the applicable Single Loss Limit of Insurance and applicable Single Loss Retention shown in ITEM 5 of the Declarations.

If this **Crime Policy** replaces prior insurance that provided the **Insured** with an extended period of time after the termination or cancellation of such prior insurance in which to **Discover** loss, then, and only with respect to loss **Discovered** during such extended period but sustained prior to the termination of such prior insurance, the coverage afforded by this **Crime Policy** applies as follows:

a.      the Company will have no liability for such loss, unless the amount of such loss exceeds the limit of insurance of that prior insurance; provided, that in such case, the Company will pay the **Insured** for the excess of such loss subject to the terms and conditions of this **Crime Policy**; and

b.      any payment the Company makes to the **Insured** for such excess loss will not be greater than the difference between the limit of insurance of the **Insured's** prior insurance and the applicable Single Loss Limit of Insurance of this **Crime Policy**. The Company will not apply the applicable Single Loss Retention to such excess loss.

5.      Ownership of Property; Interests Covered

a.      The property covered under this **Crime Policy** except as provided in 5.b. below is limited to property:

i.      that the **Insured** owns or leases;

ii.      that the **Insured** holds for others:

(a)      on the **Insured's Premises** or the **Insured's Financial Institution Premises**; or

(b)      while in transit and in the care and custody of a **Messenger**; or

iii.      for which the **Insured** is legally liable, except for property located inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this **Crime Policy** must be presented by the **Insured**.

b.      If ITEM 5 of the Declarations indicates that coverage under Insuring Agreement A.3. Employee Theft of Client Property has been purchased, then the property covered under Insuring Agreement A.3. is limited to property:

    i.       that the **Insured's Client** owns or leases;

    ii.      that the **Insured's Client** holds for others; or

    iii.     for which the **Insured's Client** is legally liable;

while the property is inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization, including the **Insured's Client**. Any claim for loss by the **Insured's Client** that is covered under this **Crime Policy** must be presented by the **Insured**.

6.     Representation, Concealment, Misrepresentation or Fraud

No statement made by the **Insured**, whether contained in the application, underwriting information or otherwise, is deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

This **Crime Policy** is void in any case of fraud by the **Insured** as it relates to this **Crime Policy** at any time. This **Crime Policy** is also void if the **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

    a.     this **Crime Policy**;

    b.     the **Money**, **Securities** or **Other Property**;

    c.     the **Insured's** interest in the **Money**, **Securities** or **Other Property**; or

    d.     a claim under this **Crime Policy**.

7.     Premiums

The **First Named Insured** is responsible for the payment of all premiums and will be the payee for any return premiums the Company pays.

8.     Transfer of Rights and Duties Under this **Crime Policy**

Rights and duties under this **Crime Policy** may not be transferred without the Company's written consent except in the case of the death of a natural person **Insured**. If such person dies, then the decedent's rights and duties will be transferred to the decedent's legal representative, but only while acting within the scope of duties as the decedent's legal representative. Until a legal representative is appointed, anyone having proper temporary custody of the decedent's property will have all rights and duties but only with respect to that property.

**B.    PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT**

1.     Limit of Insurance

    a.     <u>Policy Aggregate Limit of Insurance</u>

If ITEM 5 of the Declarations indicates that this **Crime Policy** includes a Policy Aggregate Limit of Insurance, then the Company's total liability for all loss **Discovered** during the **Policy Period** will not exceed such Policy Aggregate Limit of Insurance. The Policy Aggregate Limit of Insurance will be reduced by the amount of any payment made under the terms of this **Crime Policy**. If the Policy Aggregate Limit of Insurance is exhausted by any payment made for loss **Discovered** during the **Policy Period**, the Company will have no further liability for loss regardless of when **Discovered** and whether or not previously reported to the Company.

©2009 The Travelers Companies, Inc. All Rights Reserved

If applicable, the Policy Aggregate Limit of Insurance will be reinstated to the extent of any net recovery pursuant to Condition B.6. that is received by the Company during the **Policy Period** and before the Crime Policy Aggregate Limit of Insurance is exhausted. Recovery from reinsurance or indemnity, or both, for the Company's benefit will not be deemed a recovery as used herein. In the event that a loss of **Securities** is settled by the Company through the use of a Lost Securities Bond, such loss will not reduce the Crime Policy Aggregate Limit of Insurance, but any payment under the Lost Securities Bond reduces the Policy Aggregate Limit of Insurance under this **Crime Policy**.

The provisions of this Condition B.1.a. will not be applicable to Insuring Agreement A.2.

If ITEM 5 of the Declarations indicates that this **Crime Policy** does not include a Crime Policy Aggregate Limit of Insurance, then payment of loss under this **Crime Policy** will not reduce the Single Loss Limit of Insurance for other **Single Losses**.

b.    <u>Single Loss Limit of Insurance</u>

The maximum Single Loss Limit of Insurance for each Insuring Agreement will not exceed the applicable amount set forth in ITEM 5 of the Declarations for such Insuring Agreement.

c.    <u>Special Limit of Insurance for Specified Other Property</u>

The Company's liability for loss under Insuring Agreements C. and D. is limited as follows

i.    the lesser of $25,000. or the amount shown as the Single Loss Limit of Insurance for any **Single Loss** involving precious metals, precious or semi-precious stones, pearls, furs, or completed articles made of or containing such  enumerated materials that constitute more than half the value of such articles;

ii.    the lesser of $25,000. or the amount shown as the Single Loss Limit of Insurance for any **Single Loss**, including damage to manuscripts, drawings or records of any kind, or the cost of reconstructing them or reproducing any information contained in them;

The Special Limit of Insurance for Specified Other Property is part of, and not in addition to, any applicable limit of liability.

d.    <u>Identity Fraud Expense Reimbursement Single Loss Limit of Insurance</u>

The maximum limit of insurance per the **Insured's Management Staff Member** for each **Identity Fraud** covered under Insuring Agreement H.2. will not exceed the applicable Single Loss Limit of Insurance stated in ITEM 5 of the Declarations. All acts incidental to an **Identity Fraud**, any series of **Identity Frauds**, and all **Identity Frauds** arising from the same method of operation, whether committed by one or more persons, will be deemed to arise out of one act and will be treated as one **Identity Fraud**. If an act causes a covered loss under Insuring Agreement H.2. to more than one **Management Staff Member**, the applicable Single Loss Limit of Insurance and Retention under Insuring Agreement H.2. applies to each **Management Staff Member** separately.

e.    <u>Loss Covered Under More Than One Insuring Agreement of this  **Crime Policy**</u>

Subject to any applicable Crime Policy Aggregate Limit of Insurance, if any **Single Loss** is comprised of loss covered under more than one Insuring Agreement, the most the Company will pay the **Insured** for such **Single Loss** is the lesser of:

i.    the actual amount of such **Single Loss**; or

ii.     the sum of the Single Loss Limits of Insurance applicable to such Insuring Agreements applying to such loss.

2.     Single Loss Retention

The Company will not pay the **Insured** for any **Single Loss** unless the amount of such **Single Loss** exceeds the Single Loss Retention shown in Item 5 of the Declarations. The Company will pay the **Insured** the amount of any **Single Loss** in excess of the Single Loss Retention, up to the Single Loss Limit of Insurance for the applicable Insuring Agreement.

If more than one Single Loss Retention applies to the same **Single Loss**, then only the highest Single Loss Retention will be applied.

No Single Loss Retention applies to any legal expenses paid to the **Insured** solely under Insuring Agreement B.

3.     The Insured's Duties in the Event of a Loss

After the **Insured Discovers** a loss or a situation that may result in loss of or loss from damage to **Money**, **Securities** or **Other Property** that exceeds 25% of the Single Loss Retention, the **Insured** must:

a.     notify the Company as soon as possible;

b.     notify law enforcement authorities if the **Insured** has reason to believe that any loss, except for loss covered under Insuring Agreements A.1., A.2., A.3., or F.2., involves a violation of law;

c.     submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured's** answers;

d.     give the Company a detailed, sworn proof of loss within 120 days; and

e.     cooperate with the Company in the investigation and settlement of any claim.

Proof of loss under Insuring Agreement B. and H.1. must include: (1) an affidavit of **Forgery** setting forth the amount and cause of loss; and (2) the original written **Covered Instruments** or **Personal Covered Instruments** or a copy of such written instruments.

4.     Valuation / Settlement

Subject to the applicable limit of insurance provision (Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance) the Company will pay the **Insured** for:

a.     loss of **Money** but only up to and including its face value, and, at the Company's option, pay for loss of **Money** issued by any country other than the United States of America:

i.     at face value in the **Money** issued by that country; or

ii.     in the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**;

b.     loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**, and at the Company's option:

i.     pay the **Insured** the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the Company all the **Insured's** rights, title and interest in those **Securities**; or

        ii.      pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**; provided, the Company will be liable only for the cost of the Lost Securities Bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the loss was **Discovered**;

c.     loss of, or loss from damage to, **Other Property** or **Premises** including its exterior for the replacement cost without deduction for depreciation; provided, the Company will pay the **Insured** the lesser of the following:

        i.       the applicable Single Loss Limit of Insurance;

        ii.      the cost to replace **Other Property** or **Premises** including its exterior with property of comparable material and quality, and used for the same purpose; or

        iii.     the amount the **Insured** actually spends that is necessary to repair or replace such property;

provided, the Company will, at its option, pay the **Insured** for loss of, or loss from damage to, **Other Property** or **Premises** including its exterior, in the **Money** of the country in which the loss occurred, or in the United States of America dollar equivalent of the **Money** of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**.

The Company will not pay the **Insured** on a replacement cost basis for any loss or damage until such property is actually repaired or replaced, and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. If the lost or damaged property is not repaired or replaced, the Company will pay the **Insured** actual cash value on the day the loss was **Discovered**.

Any property that the Company pays the **Insured** for or replaces becomes the Company's property.

5.     Records

The **Insured** must keep records of all **Money**, **Securities**, and **Other Property** under this **Crime Policy** so the Company can verify the amount of any loss.

6.     Recoveries

a.     All recoveries for payments made under this **Crime Policy** should be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

        i.       first, to the **Insured** to reimburse the **Insured** for loss sustained that would have been paid under this **Crime Policy** but for the fact that it is in excess of the applicable Single Loss Limit(s) of Insurance;

        ii.      second, to the Company in satisfaction of amounts paid or to be paid to the **Insured** in settlement of the **Insured's** covered claim;

        iii.     third, to the **Insured** in satisfaction of any Single Loss Retention; and

        iv.     fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Policy**.

b.     The value of all property received by the **Insured** from any source whatever and whenever received, in connection with any matter from which a loss has arisen, will be valued as of the date received and will be deducted from the covered loss.

©2009 The Travelers Companies, Inc. All Rights Reserved

c.      Recoveries do not include any recovery:

        i.      from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit; or

        ii.     of original **Securities** after duplicates of them have been issued.

7.      Transfer of the Insured's Rights of Recovery Against Others to the Company

The **Insured** must transfer to the Company all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the Company has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

8.      Legal Action Against the Company

The **Insured** may not bring any legal action against the Company involving loss:

a.      unless the **Insured** has complied with all the terms of this **Crime Policy**;

b.      until 90 days after the **Insured** has filed proof of loss with the Company; and

c.      unless brought within two (2) years from the date the **Insured Discovers** the loss.

If any limitation in this Condition B.8. is deemed to be inconsistent with applicable law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

9.      Liberalization

If the Company adopts any revision to the Crime Terms and Conditions of this **Crime Policy** that would broaden coverage and such revision does not require an additional premium or endorsement and the revision is adopted within 45 days prior to or during the **Policy Period**, the broadened coverage will apply to this **Crime Policy** as of the date the revision is approved for general use by the applicable department of insurance.

**C.      EMPLOYEE BENEFIT PLAN PROVISIONS – INFLATION GUARD**

In compliance with certain provisions of ERISA:

1.      if any **Employee Benefit Plan** is insured jointly with any other entity under this **Crime Policy**, the **Insured** must select a Single Loss Limit of Insurance for Insuring Agreement A.2. that is sufficient to provide an amount of insurance for each **Employee Benefit Plan** that is at least equal to that required if each **Employee Benefit Plan** were insured separately;

2.      if the **Insured** is an entity other than an **Employee Benefit Plan**, any payment the Company makes to the **Insured** for loss sustained by any **Employee Benefit Plan** will be held by such **Insured** for the use and benefit of the **Employee Benefit Plan(s)** sustaining the loss; and

3.      if two or more **Employee Benefit Plans** are covered under this **Crime Policy**, any payment the Company makes for loss:

a.      sustained by two or more **Employee Benefit Plans**; or

      b.      of commingled **Money**, **Securities** or **Other Property** of two or more **Employee Benefit Plans**;

that arises out of a **Single Loss** is to be shared by each **Employee Benefit Plan** sustaining loss, in the proportion that the limit of insurance required under ERISA for each such **Employee Benefit Plan**, bears to the total of those limits of insurance.

      4.      If, at the inception date of this **Crime Policy**, or a preceding policy written by the Company that provided ERISA fidelity coverage for **Employee Benefit Plans**, the **Insured** has or had a Single Loss Limit of Insurance under such ERISA fidelity coverage for **Employee Benefit Plans** that is or was equal to or greater than the limit of insurance required under ERISA, the Single Loss Limit of Insurance under Insuring Agreement A.2. will equal the greater of the amount of the limit of insurance required by ERISA or the Single Loss Limit of Insurance set forth in Item 5. of the Declarations for Insuring Agreement A.2.

## D. CANCELLATION OR TERMINATION

1.      The **Insured** may cancel:

      a.      this **Crime Policy** in its entirety;

      b.      an Insuring Agreement; or

      c.      coverage for any **Insured**;

by mailing or delivering to the Company advance written notice of cancellation.

2.      The Company may cancel:

      a.      this **Crime Policy** in its entirety;

      b.      an Insuring Agreement; or

      c.      coverage for any **Insured**;

by mailing or delivering to the **First Named Insured** written notice of cancellation at least 20 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or 60 days before the effective date of cancellation if the Company cancels for any other reason.

The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the **Company**. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date. If this **Crime Policy** or an Insuring Agreement is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels this **Crime Policy**, the refund will be pro rata. If the **Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

3.      This **Crime Policy** terminates:

      a.      in its entirety immediately upon the expiration of the **Policy Period**;

©2009 The Travelers Companies, Inc. All Rights Reserved

b.     in its entirety immediately upon exhaustion of the Policy Aggregate Limit of Insurance, if applicable; provided, that no **Crime Policy** termination under this Condition D.3.b. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.;

c.     in its entirety immediately upon the voluntary liquidation or dissolution of the **First Named Insured**; provided, that no **Crime Policy** termination under this Condition D.3.c. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.; or

d.     as to any **Subsidiary** immediately upon the **Change of Control** of such **Subsidiary**.

4.     This **Crime Policy** terminates as to any **Employee**:

a.     as soon as the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of $10,000; or

b.     60 days after the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such **Employee** in the **Insured's** service, during the term of employment by the **Insured** or prior to employment by the **Insured**, provided such dishonest or fraudulent non-employment related act involved **Money**, **Securities** or **Other Property** is in an amount in excess of $10,000.

## E.    CHANGES

Only the **First Named Insured** is authorized to make changes in the terms of this **Crime Policy** and solely with the Company's prior written consent. This **Crime Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Crime Policy**. Notice to any representative of the **Insured** or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Crime Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Crime Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Crime Policy** issued by the Company.

## F.    ENTIRE AGREEMENT

The Declarations, the application, the Crime Terms and Conditions, and any endorsements attached thereto, constitute the entire agreement between the **Insured** and the Company.

## G.    HEADINGS

The titles of the various paragraphs of this **Crime Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

---

**It is agreed that:**

Solely with respect to the coverage shown above, Section III. DEFINITIONS S. *Employee* 1.a. is replaced with the following:

1. any natural person:

a.      while in the **Insured's** service or for   **90**   days after termination of service, unless such termination is due to **Theft** or **Forgery** or any other dishonest act committed by the **Employee**;

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106328657

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ENDORSEMENT AMENDING GENERAL AGREEMENT C. – CONSOLIDATION, MERGER OR PURCHASE OF ASSETS

This endorsement changes the following:

**Crime**

It is agreed that solely with respect to the coverage shown above:

The following replaces the second paragraph of section *II. GENERAL AGREEMENTS*, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS:

> The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided: (1) the assets of the merged, purchased, or acquired entity do not exceed 35% of the total assets of all **Insureds** as reflected in the **Insured's** most recent fiscal year-end financial statement, or (2) the merger, purchase, or acquisition occurs less than 90 days prior to the end of the **Policy Period**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2012 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REPLACE GENERAL AGREEMENT E. - CHANGE OF CONTROL - NOTICE REQUIREMENTS ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

The following replaces section **II. GENERAL AGREEMENTS**, **E. CHANGE OF CONTROL – NOTICE REQUIREMENTS**:

**E.      CHANGE OF CONTROL – NOTICE REQUIREMENTS**

When the **Insured** learns that a **Change of Control** has taken place as to the **First Named Insured**, or will take place during the **Policy Period**, the **Insured** must give the Company written notice within 90 days of the effective date of such **Change of Control**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2013 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### GLOBAL COVERAGE COMPLIANCE ENDORSEMENT – ADDING FINANCIAL INTEREST COVERAGE AND SANCTIONS CONDITION AND AMENDING TERRITORY CONDITION

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

1.    The following is added to section **III. DEFINITIONS**:

   *Financial Interest* means the **First Named Insured's** insurable interest in an **Insured** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **First Named Insured's**:

   1.    ownership of the majority of the outstanding securities or voting rights of the **Insured** representing the present right to elect, appoint, or exercise a majority control over such **Insured's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

   2.    indemnification of, or representation that it has an obligation to indemnify, the **Insured** for loss sustained by such **Insured**; or

   3.    election or obligation to obtain insurance for such **Insured**.

2.    The following replaces section **V. CONDITIONS**, **A. GENERAL CONDITIONS**, 1., Territory Covered:

   1.    Territory Covered

      a.    Except as indicated in Item 5. of the Declarations,

         i.    the Company will cover loss the **Insured** sustains anywhere in the world, and

         ii.    the Company will cover all of the **Insured's** offices and **Premises**, including any additional offices or **Premises** pursuant to sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this **Crime Policy**.

      b.    This **Crime Policy** does not apply to:

         i.    loss sustained by an **Insured** domiciled; or

         ii.    loss of **Other Property** located,

         in any country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

      c.    In the event an **Insured** sustains loss referenced in b. above to which this **Crime Policy** would have applied, the Company will reimburse the **First Named Insured** for its loss, on account of its **Financial Interest** in such **Insured**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2015 The Travelers Indemnity Company. All rights reserved.

3.  The following is added to section **V. CONDITIONS**, **B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT**:

In the event the Company reimburses the **First Named Insured** on account of its **Financial Interest** in an **Insured**, as a condition precedent to exercising rights under this **Crime Policy**, the **First Named Insured** will cause the **Insured** to comply with the conditions of this **Crime Policy**.

4   The following is added to section **V. CONDITIONS**:

**SANCTIONS**

This **Crime Policy** will provide coverage for any loss or expenses, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition or restriction.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

<div style="border:1px solid black; text-align:center;">

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

</div>

## AMENDATORY ENDORSEMENT FOR CERTAIN ERISA CONSIDERATIONS

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

1. The following replaces section **I. INSURING AGREEMENTS**, A. 2. ERISA Fidelity:

   2. ERISA Fidelity

   The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by acts of **Fraud or Dishonesty** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

2. The following is added to section **III. DEFINITIONS**:

   *Fraud or Dishonesty* has the meaning set forth in Title 29, Code of Federal Regulations, Section 2580.412-9.

   *Handled or Handling* mean "handle", "handled", "handles" or "handling" as these terms are set forth in Title 29, Code of Federal Regulations, Section 2580.412-6.

3. The following replaces section **III. DEFINITIONS**, V.

   V. *Fiduciary* means:

   1. any natural person who is a trustee, officer, **Employee**, or an administrator, of any **Employee Benefit Plan**; or

   2. any natural person who is a member of the board of directors, member of the board of trustees, a partner, an **LLC Manager**, an **LLC Member**, an **Officer-Shareholder**, an officer, or an **Employee**, of any **Employee Benefit Plan Sponsor**; while that person is **Handling Money**, **Securities**, or **Other Property** that belongs to an **Employee Benefit Plan**.

   **Fiduciary** does not mean any agent, broker, independent contractor, third party administrator, broker-dealer, registered representative, investment advisor, custodian, or other person or entity of the same general character.

4. The following replaces section **IV. EXCLUSIONS**, M and Z:

   M. This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Theft**, disappearance, damage, destruction, or disclosure of any intangible property or confidential information, including:

   1. trade secret information, confidential processing methods, or other confidential information or intellectual property of any kind, or **Electronic Data**, unless otherwise covered under Insuring Agreement F.2.; or

   2. **Computer Programs**,

   provided that this exclusion will not apply to loss that is otherwise covered under Insuring Agreement A. 2., ERISA Fidelity caused by a **Fiduciary's** access to, use of, or disclosure of, such intangible property or confidential information to commit acts of **Fraud or Dishonesty**.

   Z. This **Crime Policy** will not apply to loss resulting directly or indirectly from the diminution in value of **Money**, **Securities**, or **Other Property**, provided that this exclusion will not apply to loss that is otherwise covered under Insuring Agreement A. 2., ERISA Fidelity caused by a **Fiduciary's** acts of **Fraud or Dishonesty**.

---

| | |
|---|---|
| Issuing Company: | **Travelers Casualty and Surety Company of America** |
| Policy Number: | **106328657** |

© 2017 The Travelers Indemnity Company. All rights reserved.

5.  The following replaces section **V. CONDITIONS, A. GENERAL CONDITIONS**, 3. Extended Period to Discover Loss:

3. Extended Period to Discover Loss

The Company will pay the **Insured** for loss that the **Insured** sustained prior to the effective date of cancellation or termination of this **Crime Policy**, which is **Discovered** by the **Insured**:

    a.  no later than 90 days from the date of cancellation or termination; and

    b.  as respects any **Employee Benefit Plan**, no later than one year from the date of cancellation or termination.

Notwithstanding the above, with respect to all Insuring Agreements other than Insuring Agreement A.2. ERISA Fidelity, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**. With respect to Insuring Agreement A.2. ERISA Fidelity, the extended period to Discover Loss terminates upon the effective date of any other insurance obtained by the **Employee Benefit Plan Sponsor** or the **Employee Benefit Plan** that offers the same coverage afforded by this **Crime Policy** in an amount no less than the minimum amount required under ERISA section 412 and that provides coverage for loss sustained prior to its effective date.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2017 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TELECOMMUNICATION FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

| | Single Loss Limit of Insurance | Single Loss Retention |
|---|---|---|
| **Telecommunication Fraud** | $100,000 | $1,000 |

2. The following is added to section **I. INSURING AGREEMENTS**:

   **TELECOMMUNICATION FRAUD**

   The Company will pay the **Insured** for its **Telecommunication Charges** directly caused by **Telecommunication Fraud**.

3. The following are added to section **III. DEFINITIONS**:

   Whenever appearing in this **Crime Policy**, the following words and phrases appearing in bold type have the meanings set forth in this Section III. DEFINITIONS:

   *Telecommunication Charges* mean amounts charged to the **Insured** by its telephone service provider.

   *Telecommunication Fraud* means the unauthorized access to, or use of, the **Insured's** telephone system by a person or entity other than an **Employee**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2019 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### SOCIAL ENGINEERING FRAUD INSURING AGREEMENT ENDORSEMENT

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

1.  The following is added to ITEM 5. of the Declarations:

| Insuring Agreement | Single Loss Limit of Insurance | Single Loss Retention |
|---|---|---|
| **Social Engineering Fraud** | $100,000 | $5,000 |

2.  The following **INSURING AGREEMENT** is added to section **I. INSURING AGREEMENTS**:

    **SOCIAL ENGINEERING FRAUD**

    The Company will pay the **Insured** for the **Insured's** direct loss from the transferring, paying or delivering of **Money** or **Securities**, directly caused by **Social Engineering Fraud**.

3.  The following are added to section **III. DEFINITIONS**:

    ***Authorized Person*** means an **Officer-Shareholder**, sole proprietor, director, trustee, natural person partner, **LLC Manager** or **LLC Member** who is authorized by the **Insured** to transfer, pay, or deliver **Money** or **Securities** or to instruct **Employees** or other **Authorized Persons** to transfer, pay, or deliver **Money** or **Securities**.

    ***Communication*** means an electronic, telegraphic, cable, teletype, telephonic voice, telefacsimile, or written instruction received by an **Employee** or **Authorized Person** that:
    1.  directs the **Employee** or **Authorized Person** to transfer, pay, or deliver **Money** or **Securities**;
    2.  contains a misrepresentation of a material fact; and
    3.  is relied upon by the **Employee** or **Authorized Person**, believing the material fact to be true.

    ***Social Engineering Fraud*** means the intentional misleading of an **Employee** or **Authorized Person** by a natural person impersonating:
    1.  a **Vendor**, or that **Vendor's** attorney;
    2.  a **Client**, or that **Client's** attorney;
    3.  an **Employee**; or
    4.  an **Authorized Person**,
    through the use of a **Communication**.

    ***Vendor*** means an entity or natural person that has provided goods or services to the **Insured** under a genuine, pre-existing, written agreement or other agreed-upon arrangement.

    **Vendor** does not include any **Financial Institution**, asset manager, armored motor vehicle company, or similar entity.

4.  The following replaces section **III. DEFINITIONS**, G. **Computer System**:

    G.  ***Computer System*** means:
        1.  any computer; and
        2.  any input, output, processing, storage, or communication device, or any related network, cloud service, operating system, or application software, that is connected to, or used in connection with, such computer,
        that is rented by, owned by, leased by, licensed to, or under the direct operational control of, the **Insured**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2019 The Travelers Indemnity Company. All rights reserved.

5. Solely with respect to the Social Engineering Fraud Insuring Agreement, the following replaces section **III. DEFINITIONS**, C. **Client**:

C. ***Client*** means an entity or natural person for which the **Insured** provides goods or performs services, for a fee, or as specified in a pre-existing written agreement, but only while the written agreement is in effect.

6. The following replaces section **III. DEFINITIONS**, E. **Computer Fraud**:

E. ***Computer Fraud*** means an intentional, unauthorized, and fraudulent entry or change of data or computer instructions directly into a **Computer System**:

1. by a natural person or entity, other than an **Employee**, **Authorized Person**, independent contractor, or any individual under the direct supervision of the **Insured**, including any such entry or change made via the internet, provided that such entry or change causes **Money**, **Securities**, or **Other Property** to be transferred, paid, or delivered from inside the **Premises** or from the **Insured's Financial Institution Premises**, to a place outside the **Premises** or the **Insured's Financial Institution Premises**; or

2. made by an **Employee** or **Authorized Person** acting in good faith upon an intentional, unauthorized, and fraudulent instruction received from a computer software contractor who has a written agreement with the **Insured** to design, implement, or service **Computer Programs** for a **Computer System** covered under section **I. INSURING AGREEMENTS, F. COMPUTER CRIME** .

For purposes of this definition, an intentional, unauthorized, and fraudulent entry or change of data or computer instructions does not include such entry or change made by an **Employee**, **Authorized Person**, independent contractor, or any individual under the direct supervision of the **Insured** made in reliance upon any fraudulent electronic, cable, teletype, telephonic voice, telefacsimile, or written instruction, except as defined in E.2. above. An intentional, unauthorized, and fraudulent entry or change of data or computer instructions also does not include such entry or change that involves the use, or purported use, of any **Credit, Debit, or Charge Card** or any access, convenience, identification, stored value, or other similar cards, including the information contained on such cards.

**Computer Fraud** does not include **Social Engineering Fraud** or **Funds Transfer Fraud**.

7. The following replaces section **III. DEFINITIONS**, AA. **Funds Transfer Fraud**:

AA. ***Funds Transfer Fraud*** means:

1. an electronic, telegraphic, cable, teletype, or telephone instruction, fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay, or deliver **Money** or **Securities** from the **Transfer Account** , which instruction purports to have been transmitted by the **Insured** but was in fact fraudulently transmitted by someone other than the **Insured** without the **Insured's** knowledge or consent; or

2. a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a **Financial Institution** directing such **Financial Institution** to debit a **Transfer Account** and to transfer, pay, or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the **Insured** but was in fact fraudulently issued, **Forged**, or altered by someone other than the **Insured** without the **Insured's** knowledge or consent.

**Funds Transfer Fraud** does not include **Social Engineering Fraud**.

8. The following replaces section **III. DEFINITIONS**, DD. **Insured**:

DD. ***Insured*** means:

1. for the purposes of Insuring Agreement A.2. and the Social Engineering Fraud Insuring Agreement, any and all **Employee Benefit Plans**:
   a. which have been established or maintained by an **Employee Benefit Plan Sponsor** as of the inception date of this **Crime Policy**; or
   b. which have been created or acquired by an **Employee Benefit Plan Sponsor** after the inception date of this **Crime Policy**, subject to the provisions of General Agreements C. and D.

2. for the purposes of all Insuring Agreements, except Insuring Agreement A.2.:
   a. the **First Named Insured**,
   b. any **Subsidiary**,
   c. any **Sponsored Plan**, or
   d. any other entity listed in Item 1. of the Declarations.

© 2019 The Travelers Indemnity Company. All rights reserved.

9.  The following replaces section **IV. EXCLUSIONS**, G., H., and R.:

G.  This **Crime Policy** will not apply to loss or damages resulting directly or indirectly from the input of **Electronic Data** by a natural person having the authority to enter the **Computer System**, unless covered under Insuring Agreements A.1., A.2., A.3., F.1., but only when covered under section III. DEFINITIONS, E., **Computer Fraud**, 2., F.2., G., or the Social Engineering Fraud Insuring Agreement.

H.  This **Crime Policy** will not apply to loss resulting from forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions used as source documentation to enter **Electronic Data** or send instructions, provided this does not apply to Insuring Agreements A.1., A.2., A.3., or the Social Engineering Fraud Insuring Agreement.

R.  This **Crime Policy** will not apply to loss resulting directly or indirectly from:

1.  the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase, whether genuine or fictitious; or

2.  any other giving or surrendering of, or voluntary parting with, **Money**, **Securities** or **Other Property**, whether or not induced by any dishonest or fraudulent act, except when covered under:

    a.  Insuring Agreement A.;

    b.  Insuring Agreement E.;

    c.  Insuring Agreement F1., or

    d.  the Social Engineering Fraud Insuring Agreement.

10. Solely with respect to the Social Engineering Fraud Insuring Agreement, the following replaces section **IV. EXCLUSIONS**, T.:

T.  This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property**:

1.  while in the mail; or

2.  while in the custody of any messenger, carrier for hire, or armored motor vehicle company.

11. Solely with respect to the Social Engineering Fraud Insuring Agreement, the following are added to section **IV. EXCLUSIONS**:

This **Crime Policy** will not apply to:

a.  loss or damage due to **Theft** by an **Employee**, **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, or acceptance of money orders or **Counterfeit Money**;

b.  loss due to any investment in **Securities**, or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine;

c.  loss due to the failure, malfunction, illegitimacy, inappropriateness, or inadequacy of any product or service;

d.  loss resulting directly or indirectly from the failure of any party to perform in whole or in part under any contract;

e.  loss due to any non-payment of or default upon any loan, extension of credit, or similar promise to pay;

f.  loss due to any party's use of or acceptance of any **Credit**, **Debit or Charge Card** or any access, convenience, identification, stored value or other similar card or instrument, including the information contained on such cards, whether or not genuine; or

g.  loss due to items of deposit which are not finally paid for any reason, including forgery or any other fraud; however, this exclusion does not apply to United States Government checks or drafts that are returned by the United States Government for any reason after the funds for said checks or drafts have been credited to the **Insured's** account at a **Financial Institution**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

### DELETE EXCLUSION FOR PRIOR LOSSES INVOLVING SUBSIDIARIES ENDORSEMENT

This endorsement changes the following:

**Crime**

---

**It is agreed that:**

Section **IV. EXCLUSIONS**, BB. is deleted.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## MICHIGAN CHANGES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Crime**

---

**It is agreed that:**

Notwithstanding anything to the contrary, notice given by or on behalf of the **Named Insured** to the Company's authorized agent, with particulars sufficient to identify the **Insured**, will be considered notice to the Company.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### AMEND EXTENDED PERIOD TO DISCOVER LOSS ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

---

**It is agreed that:**

Solely with respect to the coverage shown above:

Section V. CONDITIONS A.3.a. is replaced with the following:

a.      no later than **365**   days from the date of cancellation or termination; and

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106328657

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## MICHIGAN CANCELLATION OR TERMINATION ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

1.      The following replaces section *V., CONDITIONS*, **D.2.**:

    2.      The Company may cancel:
            a.      this **Crime Policy** in its entirety;
            b.      an Insuring Agreement; or
            c.      coverage for any **Insured**;

            by mailing or delivering to the **First Named Insured** written notice of cancellation at least **20** days (number of days must equal or exceed 20 days) before the effective date of cancellation if the Company cancels for nonpayment of premium; or **60** days (number of days must equal or exceed 60 days) before the effective date of cancellation if the Company cancels for any other reason.

            The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the Company. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date. If this **Crime Policy** or an Insuring Agreement is cancelled, the Company will send the **First Named Insured** any premium refund due, computed on a pro-rata basis. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

2.      The following is added to section *V., CONDITIONS*, **D. CANCELLATION OR TERMINATION**:

    5.      The Company will not be required to renew this **Crime Policy** upon its expiration. If the Company elects not to renew, the Company will provide to the **First Named Insured** written notice to that effect **45** days (number of days must equal or exceed 45 days) before the Expiration Date set forth in ITEM 2 of the Declarations.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND CANCELLATION AS TO ANY EMPLOYEE ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

The following replaces section **V. CONDITIONS D.4.**:

4.   This **Crime Policy** terminates as to any **Employee**:

   a.   as soon as the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of $25,000.; or

   b.   60 days after the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such **Employee** in the **Insured's** service, during the term of employment by the **Insured** or prior to employment by the **Insured**, provided such dishonest or fraudulent non-employment related act involved **Money, Securities** or **Other Property** in an amount in excess of $25,000.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2013 The Travelers Indemnity Company. All rights reserved.

Liability Insuring Agreements .......................... 1
  Privacy And Security. ................................1
  Media. ..................................................1
  Regulatory Proceedings. ..........................1
Breach Response Insuring Agreements ............... 1
  Privacy Breach Notification. ......................1
  Computer And Legal Experts. ....................1
  Betterment. ...........................................1
  Cyber Extortion. .....................................1
  Data Restoration. ...................................1
  Public Relations. .....................................1
Cyber Crime Insuring Agreements..................... 1
  Computer Fraud. ....................................1
  Funds Transfer Fraud...............................1
  Social Engineering Fraud. .........................2
  Telecom Fraud. ......................................2
Business Loss Insuring Agreements ................... 2
  Business Interruption. ..............................2
  Dependent Business Interruption. ..............2
  Reputation Harm. ...................................2
Definitions .................................................. 2
  Accounting Costs. ...................................2
  Additional Insured. ..................................2
  Adverse Media Report. ............................2
  Approved Provider...................................2
  Automatic ERP. ......................................2
  Betterment Costs. ..................................2
  Business Interruption Loss. .......................3
  Change Of Control. .................................3
  Claim. ...................................................3
  Client. ...................................................3
  Computer And Legal Expert Costs. ............3
  Computer Fraud. ....................................4
  Computer System. ..................................4
  Confidential Information. ..........................4
  Covered Material. ...................................4
  Cyber Extortion Costs. .............................4
  Cyber Extortion Threat. ............................4
  Defense Costs. .......................................4
  Discover, Discovered, Discovery. ...............5
  Employee...............................................5
  Executive Officer. ...................................5
  Extra Expense. .......................................5
  First Party Event. ....................................5
  First Party Insuring Agreements. ................6
  First Party Loss. ......................................6
  Funds Transfer Fraud...............................6
  Impacted Parties. ....................................6
  Income Loss. ..........................................6
  Independent Contractor. ..........................7

Insured..................................................7
Insured Entity. ........................................7
Insured Person. .......................................7
IT Provider. .............................................7
IT Provider Breach. ..................................7
Loss. .....................................................7
Media Act. ..............................................8
Merchant Service Agreement......................8
Money. ..................................................8
Notification. ...........................................8
Optional ERP. .........................................8
Other Property. .......................................8
Payment Card Contract Penalties. ..............8
Payment Card Security Standards................9
Period Of Indemnity. ................................9
Period Of Restoration. ..............................9
Policy Period. ..........................................9
Pollutant. ...............................................9
Potential Claim. .......................................9
Privacy And Security Act............................9
Privacy Breach. .......................................9
Privacy Breach Notification Costs. ...............9
Privacy Policy. .........................................9
Public Relations Costs. ..............................10
Ransom. .................................................10
Regulatory Costs. ....................................10
Regulatory Proceeding. .............................10
Reputation Harm. ....................................10
Restoration Costs. ...................................10
Run-Off Period. .......................................10
Securities. ..............................................10
Security Breach. ......................................10
Social Engineering Fraud............................11
Subsidiary. .............................................11
System Failure. ........................................11
Telecom Charges. ....................................11
Telecom Fraud. .......................................11
Vendor. ..................................................11
Virtual Currency. .....................................11
Virus. ....................................................11
Wait Period. ...........................................11
Wrongful Act. ..........................................11
Exclusions.................................................. 12
Assumed Liability......................................12
Bodily Injury. ..........................................12
Conduct. ................................................12
Cyber Crime.............................................12
Government Action. ..................................13
Infrastructure. .........................................13
Insured vs. Insured. ..................................13

Intellectual Property. ..........................................................13
Labor Disputes. ...................................................................13
Licensing And Royalties. .....................................................13
Ownership Rights. ...............................................................13
Physical Peril. ......................................................................13
Pollution. .............................................................................14
Prior Acts. ............................................................................14
Prior Matters. ......................................................................14
Property Damage. ...............................................................14
Securities Laws. ...................................................................14
Unlawful Collection. ...........................................................15
Unsolicited Communications. .............................................15
War. ......................................................................................15
**Limits And Retentions** ...................................................**15**
Limit Of Insurance. .............................................................15
Retention. ............................................................................15
**Other Conditions** ............................................................**16**
Allocation. ...........................................................................16
Cancelation And Nonrenewal. ...........................................16
Change Of Structure. ..........................................................16
Claim Defense. ....................................................................16
Cyber Crime And Business Loss Change. ..........................17
ERP – Automatic. .................................................................17
ERP – Optional. ...................................................................17
Extended Discovery Period. ................................................17
Income Loss Appraisal. .......................................................18
Notice Of Claim. ..................................................................18
Notice Of First Party Event. ................................................18
Other Insurance. .................................................................18
Property Covered. ...............................................................18
Recovery And Subrogation. ................................................19
Related Claims. ....................................................................19
Representations. ..................................................................19
Settlement. ..........................................................................19
Subsidiaries. .........................................................................19
Suits Against The Insurer – Cyber Crime. ..........................20
Valuation Under First Party Insuring Agreements. ............20

© 2020 The Travelers Indemnity Company. All rights reserved.

 **TRAVELERS**

**CyberRisk Coverage**

Only the Insuring Agreements with Limits shown in the CyberRisk Declarations apply.

## Liability Insuring Agreements

**Privacy And Security.**  The Insurer will pay *Loss* on behalf of the *Insured*, resulting from a *Claim* that is first made during the *Policy Period*, or any applicable extended reporting period, for a *Privacy And Security Act*.

**Media.**  The Insurer will pay *Loss* on behalf of the *Insured*, resulting from a *Claim* that is first made during the *Policy Period*, or any applicable extended reporting period, for a *Media Act*.

**Regulatory Proceedings.**  The Insurer will pay *Defense Costs* and *Regulatory Costs* on behalf of the *Insured*, resulting from a *Regulatory Proceeding* that is first commenced during the *Policy Period*, or any applicable extended reporting period, for a *Privacy And Security Act* or *Media Act*.

## Breach Response Insuring Agreements

**Privacy Breach Notification.**  The Insurer will reimburse, or pay on behalf of, the *Insured* for *Privacy Breach Notification Costs* resulting from an actual or suspected *Privacy Breach* that is *Discovered* during the *Policy Period*, or any extended discovery period.

**Computer And Legal Experts.**  The Insurer will reimburse, or pay on behalf of, the *Insured* for *Computer And Legal Expert Costs* resulting from an actual or suspected:

1.  *Privacy Breach*;
2.  *Security Breach*; or
3.  *Cyber Extortion Threat*,

that is *Discovered* during the *Policy Period*, or any extended discovery period.

**Betterment.**  The Insurer will reimburse the *Insured* for *Betterment Costs*, following a *Security Breach* that is *Discovered* during the *Policy Period*.

**Cyber Extortion.**  The Insurer will reimburse, or pay on behalf of, the *Insured* for *Cyber Extortion Costs*, resulting from a *Cyber Extortion Threat* that is *Discovered* during the *Policy Period*.

**Data Restoration.**  The Insurer will reimburse, or pay on behalf of, the *Insured* for *Restoration Costs*, directly caused by a *Security Breach* that is *Discovered* during the *Policy Period*.

**Public Relations.**  The Insurer will reimburse, or pay on behalf of, the *Insured* for *Public Relations Costs*, resulting from an actual or suspected:

1.  *Privacy And Security Act*; or
2.  *Media Act*,

that is *Discovered* during the *Policy Period*, or any extended discovery period.

## Cyber Crime Insuring Agreements

**Computer Fraud.**  The Insurer will pay the *Insured Entity* for its direct loss of *Money*, *Securities*, or *Other Property*, directly caused by *Computer Fraud* that is *Discovered* during the *Policy Period*.

**Funds Transfer Fraud.**  The Insurer will pay the *Insured Entity* for its direct loss of *Money* or *Securities*, directly caused by *Funds Transfer Fraud* that is *Discovered* during the *Policy Period*.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Cyber Crime Insuring Agreements continued from previous page.*

| | |
|---|---|
| **Social Engineering Fraud.** | The Insurer will pay the *Insured Entity* for its direct loss of *Money* or *Securities*, directly caused by *Social Engineering Fraud* that is *Discovered* during the *Policy Period*. |
| **Telecom Fraud.** | The Insurer will pay the *Insured Entity* for its *Telecom Charges*, directly caused by *Telecom Fraud* that is *Discovered* during the *Policy Period*. |

## Business Loss Insuring Agreements

| | |
|---|---|
| **Business Interruption.** | The Insurer will pay the *Insured* for its *Business Interruption Loss* that is directly caused by any of the following, if *Discovered* during the *Policy Period*: |

1. A *Security Breach* that results in a total or partial interruption of a *Computer System*.
2. A *System Failure*, if applicable.
3. The voluntary shutdown of a *Computer System* by the *Insured*, if it is reasonably necessary to minimize the *Loss* caused by a *Security Breach* or *Privacy Breach* in progress.

| | |
|---|---|
| **Dependent Business Interruption.** | The Insurer will pay the *Insured* for its *Business Interruption Loss*, directly caused by an *IT Provider Breach* that is *Discovered* during the *Policy Period*. |
| **Reputation Harm.** | The Insurer will pay the *Insured* for its *Reputation Harm*, directly caused by an *Adverse Media Report* or *Notification* that: |

1. first occurs during, or within 60 days after, the *Policy Period*; and
2. directly relates to a *Privacy Breach* or *Security Breach* that is *Discovered* during the *Policy Period*.

## Definitions

| | |
|---|---|
| *Accounting Costs.* | Means the reasonable fees or costs of a forensic accounting firm, incurred by the *Insured Entity*, to calculate *Income Loss*, even if such calculation shows there has been no *Income Loss*. |
| *Additional Insured.* | Means a person or entity, not otherwise an *Insured*, with whom the *Insured Entity* has entered into a written agreement to include as an *Insured*, but only for *Wrongful Acts*: |

1. by, or on behalf of, the *Insured Entity* under such agreement; and
2. that occur after the *Insured Entity* has executed such agreement.

| | |
|---|---|
| *Adverse Media Report.* | Means any communication of an actual or potential *Privacy Breach* or *Security Breach* by a media outlet. Multiple *Adverse Media Reports* regarding the same *Privacy Breach* or *Security Breach* are deemed one *Adverse Media Report*. |
| *Approved Provider.* | Means a service provider approved by the Insurer in writing to the *Insured*. |
| *Automatic ERP.* | Means a 90-day extended reporting period starting on the effective date this Coverage is canceled or not renewed. |
| *Betterment Costs.* | 1. Means the reasonable costs incurred and paid by the *Insured*, with the Insurer's written consent, for hardware or software to improve a *Computer System* after a *Security Breach*, if: |

   a. the *Security Breach* has been stopped or contained, and resulted in covered *Computer And Legal Expert Costs*;
   b. the *Approved Provider* that provided computer services in response to such *Security Breach*:
      i. has identified a weakness in a *Computer System* that caused, or contributed to, the *Security Breach*; and
      ii. recommends the improvements to prevent a future *Security Breach* from exploiting such weakness; and

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

|  | c. such improvements are incurred and paid for by the *Insured* within the earlier of 90 days after: |
|---|---|

         i.   the recommendation by the *Approved Provider*; or

         ii.  the end of the *Policy Period*.

Costs for improvements that are subject to a license, lease, or subscription will be limited to the pro rata portion of such costs for the first 12 months.

2. Does not include wages, benefits, or overhead of any *Insured*.

**Business Interruption Loss.**

1. Means:

   a. *Income Loss* and *Extra Expense* incurred or paid by the *Insured Entity* during the *Period Of Restoration*; and

   b. *Accounting Costs*, if the *Insured Entity's* business operations are interrupted beyond the *Wait Period*.

2. Does not include loss arising out of harm to the *Insured Entity's* reputation.

**Change Of Control.**

Means when:

1. more than 50% of the Named Insured's assets are acquired; or

2. the Named Insured is merged with, or consolidated into, another entity, and the Named Insured is not the surviving entity.

**Claim.**

Means:

1. a written demand for monetary or nonmonetary relief, including injunctive relief, commenced by an *Insured's* receipt of such written demand;

2. a civil proceeding, commenced by the service of a complaint or similar pleading;

3. an arbitration, mediation, or similar alternative dispute resolution proceeding, commenced by the service of an arbitration petition or similar legal document;

4. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding, commenced by an *Insured's* receipt of such written request; or

5. for the Regulatory Proceedings Insuring Agreement only, a *Regulatory Proceeding*, commenced by:

   a. the filing of charges;

   b. the filing of an investigative order;

   c. the service of a summons; or

   d. the service or filing of a similar document,

against an *Insured* for a *Wrongful Act*. Except under Other Conditions, Notice Of Claim, a *Claim* is deemed made when commenced.

**Client.**

Means a person or entity to whom the *Insured Entity*:

1. provides goods; or

2. performs services,

for a fee, or under a written agreement.

**Computer And Legal Expert Costs.**

1. Means the reasonable fees or costs incurred or paid by the *Insured* for services recommended and provided by an *Approved Provider*, to:

   a. conduct a forensic analysis to determine the existence and cause of a *Privacy Breach*, *Security Breach*, or *Cyber Extortion Threat*;

   b. determine whose *Confidential Information* was lost or stolen; or accessed or disclosed without authorization;

   c. contain or stop a *Privacy Breach* or *Security Breach* in progress;

   d. certify the *Computer System* meets *Payment Card Security Standards*, if a *Security Breach Discovered* during the *Policy Period* results in noncompliance with such standards, but only for the first certification; or

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

|   |   |   |
|---|---|---|
| | | e.   provide legal services to respond to a *Privacy Breach* or *Security Breach*. |
| | 2. | Does not include *Defense Costs* or *Privacy Breach Notification Costs*. |

*Computer Fraud.*
1. Means an intentional, unauthorized, and fraudulent entry or change of data or computer instructions, directly into or within, a *Computer System*, that:
   a. is not made by an *Insured Person*, an *Independent Contractor*, or any other person under the direct supervision of the *Insured*; and
   b. causes *Money*, *Securities*, or *Other Property* to be transferred, paid, or delivered from inside the *Insured Entity's* premises or the *Insured Entity's* financial institution premises to a place outside of such premises.
2. Does not include *Social Engineering Fraud*.

*Computer System.* Means a computer and connected input, output, processing, storage, or communication device, or related network, operating system, website, or application software, that is:
1. under the operational control of, and owned by, licensed to, or leased to:
   a. the *Insured Entity*; or
   b. an *Insured Person*, while authorized by, and transacting business on behalf of, the *Insured Entity*, except under the Betterment or Data Restoration Insuring Agreements, or any Cyber Crime Insuring Agreement; or
2. operated by an *IT Provider*, but only the portion of such computer system used to provide hosted computer resources to the *Insured Entity*, except under the Betterment or Business Interruption Insuring Agreements.

*Confidential Information.* Means a third party's or *Insured Person's* private or *Confidential Information* that is in the care, custody, or control of the *Insured Entity*, or a service provider acting on behalf of the *Insured Entity*.

*Covered Material.*
1. Means content that is created or disseminated, via any form or expression, by, or on behalf of, the *Insured Entity*.
2. Does not include:
   a. tangible product designs; or
   b. content created or disseminated by the *Insured Entity* on behalf of a third party.

*Cyber Extortion Costs.*
1. Means, with the Insurer's prior written consent:
   a. *Ransom*, in direct response to a *Cyber Extortion Threat*;
   b. reasonable amounts incurred or paid by the *Insured* in the process of paying, or attempting to pay, *Ransom*; or
   c. reasonable amounts incurred or paid by the *Insured*, recommended by an *Approved Provider*, to mitigate *Ransom*.
2. Does not include *Computer And Legal Expert Costs* or *Restoration Costs*.

*Cyber Extortion Threat.* Means a threat to:
1. access or disclose:
   a. *Confidential Information*; or
   b. an *Insured Entity's* information without authorization; or
2. commit or continue a *Security Breach*,
made against the *Insured Entity* for *Ransom*.

*Defense Costs.*
1. Means reasonable fees and costs incurred by the Insurer, or the *Insured* with the Insurer's prior written consent, in the:
   a. investigation;
   b. defense;
   c. settlement; or

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

    d.   appeal,

of a *Claim*.

2.   Includes up to $1,000 per day for loss of earnings due to an *Insured Person's* attendance in court, if at the Insurer's request.

3.   Does not include wages, benefits, or overhead of the Insurer or of the *Insured*.

**Discover, Discovered, Discovery.** Means when an *Executive Officer* first becomes aware of facts that would cause a reasonable person to assume that a *First Party Loss* has been or will be incurred, regardless of when the act or acts causing or contributing to such *First Party Loss* occurred, even though the exact amount or details of such *First Party Loss* may not then be known.

**Employee.** 1.   Means a natural person while their labor is engaged and directed by the *Insured Entity*, and who is:

    a.   a full-time, part-time, seasonal, or temporary worker compensated directly by the *Insured Entity* through wages, salaries, or commissions;

    b.   a volunteer, student, or intern; or

    c.   a worker whose services have been leased to the *Insured Entity* by a labor leasing firm under a written agreement.

2.   Does not include any:

    a.   agent;

    b.   broker;

    c.   consignee;

    d.   independent contractor; or

    e.   representative,

of the *Insured Entity*.

**Executive Officer.** Means a natural person while acting as the *Insured Entity's*:

1.   chief executive officer;

2.   chief financial officer;

3.   chief information security officer;

4.   risk manager;

5.   in-house general counsel; or

6.   the functional equivalent of 1 through 5.

**Extra Expense.** Means reasonable costs incurred by the *Insured Entity*, with the Insurer's written consent, that:

1.   result from a *First Party Event*;

2.   are in excess of the *Insured Entity's* normal operating costs;

3.   are intended to reduce *Income Loss*; and

4.   would not have been incurred had there been no *First Party Event*.

**First Party Event.** 1.   Means:

    a.   *Computer Fraud*;

    b.   *Cyber Extortion Threat*;

    c.   *Funds Transfer Fraud*;

    d.   *IT Provider Breach*;

    e.   *Media Act*;

    f.   *Privacy Breach*;

    g.   *Security Breach*;

    h.   *Social Engineering Fraud*;

    i.   *System Failure*; or

    j.   *Telecom Fraud*.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

2. *First Party Events* that have a common:
    a. nexus;
    b. set of facts;
    c. circumstance;
    d. situation;
    e. event; or
    f. decision,
    are deemed a single *First Party Event.*

**First Party Insuring Agreements.** Means the:
1. Breach Response Insuring Agreements;
2. Business Loss Insuring Agreements; and
3. Cyber Crime Insuring Agreements.

**First Party Loss.**
1. Means:
    a. *Betterment Costs;*
    b. *Business Interruption Loss;*
    c. *Computer And Legal Expert Costs;*
    d. *Cyber Extortion Costs;*
    e. *Money;*
    f. *Other Property;*
    g. *Privacy Breach Notification Costs;*
    h. *Public Relations Costs;*
    i. *Reputation Harm;*
    j. *Restoration Costs;*
    k. *Securities;* or
    l. *Telecom Charges.*
2. Other than *Accounting Costs*, does not include amounts:
    a. to establish *First Party Loss;* or
    b. to prepare the *Insured Entity's* Proof of Loss.

**Funds Transfer Fraud.**
1. Means a fraudulent instruction that:
    a. is electronically sent to a financial institution that is not an *Insured*, at which the *Insured Entity* maintains an account;
    b. directs the transfer, payment, or delivery of *Money* or *Securities* from the *Insured Entity's* account;
    c. is purportedly sent by the *Insured Entity;*
    d. is sent by someone, other than an *Insured;* and
    e. is sent without the *Insured Entity's* knowledge or consent.
2. Does not include *Social Engineering Fraud.*

**Impacted Parties.** Means the persons or entities whose *Confidential Information* was, or is suspected to have been, stolen or lost, or accessed or disclosed without authorization.

**Income Loss.**
1. Means pretax net profit the *Insured Entity* did not earn, and net loss the *Insured Entity* incurred, because of a *First Party Event.* Continuing normal and necessary operating expenses and payroll are part of the pretax net profit or net loss calculation.
2. Does not include:
    a. *Extra Expense;*
    b. contractual penalties;

CYB-16001 Rev. 06-20
© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

    c.   costs incurred to replace or improve a *Computer System* to a level of functionality beyond what existed prior to the *First Party Event*;

    d.   costs incurred to identify or remediate computer system errors or vulnerabilities;

    e.   interest or investment income; or

    f.   loss incurred due to unfavorable business conditions not related to the *First Party Event.*

**Independent Contractor.** Means a natural person, other than an *Employee*, while performing services for the *Insured Entity* under a written agreement.

**Insured.** Means:
1. *Insured Persons*;
2. *Insured Entities*; or
3. for the Liability Insuring Agreements only, also includes *Additional Insureds.*

**Insured Entity.** Means:
1. the Named Insured; or
2. *Subsidiaries.*

**Insured Person.** Means:
1. *Employees*;
2. natural persons while:
   a. officers;
   b. partners;
   c. the sole proprietor;
   d. in-house general counsel; or
   e. members of a board of directors, trustees, or governors,
   of the *Insured Entity*; or
3. for the Liability Insuring Agreements only, also includes *Independent Contractors.*

**IT Provider.** Means an entity while under a written agreement with the *Insured Entity* to provide it with:
1. hosted computer application services;
2. cloud services or computing;
3. electronic data hosting, back-up, storage, and processing;
4. co-location services;
5. platform-as-a-service; or
6. software-as-a-service.

**IT Provider Breach.** Means:
1. unauthorized access to;
2. use of authorized access to cause intentional harm to;
3. a denial-of-service attack against; or
4. the introduction of a *Virus* into,
an *IT Provider's* computer system, resulting in total or partial interruption.

**Loss.** 1. Means:
   a. *Defense Costs*;
   b. damages, judgments, settlements, or prejudgment or postjudgment interest, that an *Insured* is legally obligated to pay as a result of a *Claim*, including:
      i. court awarded legal fees; and

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

        ii.   punitive or exemplary damages, or the multiple portion of a multiplied damage award, to the extent insurable under the most favorable applicable law;

    c.   *Payment Card Contract Penalties;*

    d.   for the Regulatory Proceedings Insuring Agreement, means *Regulatory Costs*; or

    e.   for *First Party Insuring Agreements*, means *First Party Loss.*

2.   *Loss* does not include voluntary payments made by the *Insured* with respect to a *Claim.*

3.   *Loss*, other than *Defense Costs*, does not include:

    a.   civil or criminal fines, penalties, sanctions, or taxes, except for:

        i.   *Payment Card Contract Penalties*; or

        ii.   *Regulatory Costs*;

    b.   amounts uninsurable under applicable law;

    c.   restitution, return, or disgorgement of any profits;

    d.   liquidated damages in excess of the amount for which the *Insured* would be liable absent the liquidated damages provision of a contract; or

    e.   the cost of complying with injunctive or nonmonetary relief.

**Media Act.**   Means, in *Covered Material*:

1.   the unauthorized use of copyright, title, slogan, trademark, trade dress, service mark, domain name, logo, or service name;

2.   the unauthorized use of a literary or artistic format, character, or performance;

3.   a violation of an individual's right of privacy or publicity;

4.   defamation, libel, slander, trade libel, or other tort related to disparagement or harm to the reputation or character of any person or entity;

5.   the misappropriation of ideas under an implied contract;

6.   improper deep-linking or framing; or

7.   unfair competition, when alleged in connection with 1 through 6.

**Merchant Service Agreement.**   Means a contract between the *Insured Entity* and an acquiring bank, or other acquiring institution, that establishes the terms and conditions for accepting and processing payment card transactions.

**Money.**   1.   Means:

    a.   currency, coins, or bank notes in circulation;

    b.   bullion;

    c.   *Virtual Currency*;

    d.   traveler's checks;

    e.   certified or cashier's checks; or

    f.   money orders.

2.   Does not include *Securities*.

**Notification.**   Means written notice to *Impacted Parties* about a *Privacy Breach* or *Security Breach*. Multiple *Notifications* about the same *Privacy Breach* or *Security Breach* are deemed one *Notification*.

**Optional ERP.**   Means an extended reporting period for the time shown in the Optional ERP Endorsement starting on the effective date this Coverage is:

1.   canceled; or

2.   not renewed.

**Other Property.**   Means tangible property, other than *Money* or *Securities* that has intrinsic value.

**Payment Card Contract Penalties.**   Means fines, penalties, or assessments imposed under a *Merchant Service Agreement* against an *Insured Entity* for noncompliance with *Payment Card Security Standards*.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

| | |
|---|---|
| *Payment Card Security Standards.* | Means the Payment Card Industry Data Security Standard (PCI-DSS), or similar standard, to which the *Insured Entity* has agreed in a *Merchant Service Agreement*. |

*Period Of Indemnity.*     Means the Period Of Indemnity shown in the CyberRisk Declarations. It begins on the earlier of the date of the first:

1. *Notification;* or
2. *Adverse Media Report,*

whichever is earlier.

*Period Of Restoration.*     Means the period of time that begins after the *Wait Period* ends, and ends on the earlier of:

1. the expiration of the Period Of Restoration shown in the CyberRisk Declarations; or
2. when the *Insured Entity's* business operations have been restored for a consecutive 24-hour period to the level of operation that existed immediately before the *First Party Event.*

*Policy Period.*     Means the Policy Period shown in the Declarations, which is subject to the cancelation of this Policy.

*Pollutant.*     Means a solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.

*Potential Claim.*     Means conduct or circumstances that could reasonably be expected to give rise to a *Claim.*

*Privacy And Security Act.*     Means:

1. the failure to prevent a *Privacy Breach;*
2. the failure to destroy *Confidential Information;*
3. a violation of law, when alleged in connection with 1 or 2;
4. the failure to provide *Notification* required by law;
5. the failure to comply with a *Privacy Policy;*
6. the unauthorized, unlawful, or wrongful collection of *Confidential Information;* or
7. the failure to prevent a *Security Breach*, directly resulting in the:
   a. alteration or deletion of *Confidential Information;*
   b. transmission of a *Virus* into a computer or network system that is not a *Computer System;*
   c. participation in a denial-of-service attack directed against a computer or network system that is not a *Computer System;* or
   d. failure to provide an authorized user with access to a *Computer System.*

*Privacy Breach.*     Means the loss or theft of, or unauthorized access to or disclosure of, *Confidential Information.*

*Privacy Breach Notification Costs.*     Means reasonable costs or fees incurred or paid by an *Insured Entity*, voluntarily or as required by agreement or law, for:

1. printing and delivering notice to;
2. providing credit or identity monitoring for up to 24 months, or longer where required by law, to;
3. call center services for;
4. the costs to purchase an identity fraud insurance policy to benefit natural persons who are; or
5. with the Insurer's prior written consent, other services to mitigate *Loss* or provide notice to, *Impacted Parties*, if recommended and provided by an *Approved Provider.*

*Privacy Policy.*     Means the *Insured Entity's* publicly available written policies or procedures regarding *Confidential Information.*

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

**Public Relations Costs.**  Means reasonable costs or fees for public relations services recommended and provided by an *Approved Provider* to mitigate or prevent negative publicity.

**Ransom.**  1.  Means:
       a.  *Money;*
       b.  *Securities*; or
       c.  the fair market value of property or services,
    paid or surrendered by, or on behalf of, the *Insured.*
2.  Will be valued as of the date paid or surrendered.

**Regulatory Costs.**  Means:
1.  civil money fines;
2.  civil penalties; or
3.  amounts deposited in a consumer redress fund,
imposed in a *Regulatory Proceeding*, to the extent insurable under the most favorable applicable law.

**Regulatory Proceeding.**  Means an administrative or regulatory proceeding, or a civil investigative demand, brought by a domestic or foreign governmental entity.

**Reputation Harm.**  Means damage to the *Insured Entity's* reputation incurred during the *Period Of Indemnity* that results in *Income Loss*, other than the value of:
1.  coupons;
2.  price discounts;
3.  prizes;
4.  awards; or
5.  consideration given by the *Insured* in excess of the contracted or expected amount.

**Restoration Costs.**  1.  Means the reasonable amounts incurred or paid by the *Insured*, with the Insurer's prior written consent:
       a.  to restore or recover damaged or destroyed computer programs, software, or electronic data stored within a *Computer System*, to its condition immediately before a *Security Breach*; or
       b.  to determine that such computer programs, software, or electronic data cannot reasonably be restored or recovered.
2.  Does not include:
       a.  costs to recover or replace computer programs, software, or electronic data that the Insured did not have a license to use;
       b.  costs to design, update, or improve the operation of computer programs or software;
       c.  costs to recreate work product, research, or analysis; or
       d.  wages, benefits, or overhead of the *Insured.*

**Run-Off Period.**  Means the period starting on the date of the *Change Of Control* to the end of the *Policy Period.*

**Securities.**  Means written agreements representing *Money* or property, other than *Virtual Currency.*

**Security Breach.**  Means:
1.  the unauthorized access to;
2.  the use of authorized access to cause intentional harm to;
3.  a denial-of-service attack against; or
4.  the introduction of a *Virus* into,
a *Computer System.*

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

| | |
|---|---|
| *Social Engineering Fraud.* | Means intentionally misleading an *Insured Person*, by providing an instruction that: |

1. is not made by an *Insured*;
2. is purportedly from a *Vendor*, *Client*, or *Insured Person*;
3. directs the *Insured Person* to transfer, pay, or deliver *Money* or *Securities*;
4. contains a misrepresentation of material fact; and
5. is relied upon by the *Insured Person*, believing the material fact to be true.

| | |
|---|---|
| *Subsidiary.* | Means: |

1. an entity while the Named Insured owns more than 50% of the outstanding securities or voting rights representing the right to select the entity's board of directors, or functional equivalent;
2. a nonprofit entity while the Named Insured exercises management control over such entity; or
3. an entity while the Named Insured owns exactly 50%, as a joint venture, and while an *Insured Entity* controls the entity's management and operations under a written agreement.

| | |
|---|---|
| *System Failure.* | Means an accidental, unintentional, and unplanned total or partial interruption of a *Computer System*, not caused by: |

1. a *Security Breach*; or
2. a total or partial interruption of a third party computer system or network.

| | |
|---|---|
| *Telecom Charges.* | Means amounts charged to the *Insured Entity* for telephone services by its telephone service provider. |
| *Telecom Fraud.* | Means the unauthorized access to, or use of, the *Insured Entity's* telephone system by a person or entity other than an *Insured Person*. |
| *Vendor.* | Means a person or entity that provides goods or services to the *Insured Entity* under an agreement. |
| *Virtual Currency.* | 1. Means a publicly available digital or electronic medium of exchange used and accepted as a means of payment. |

2. Does not include:
   a. coupons;
   b. discounts;
   c. gift cards;
   d. rebates;
   e. reward points; or
   f. similar mediums of exchange.

| | |
|---|---|
| *Virus.* | Means malicious code that could destroy, or change the integrity or performance of, electronic data, software, or operating systems. |
| *Wait Period.* | Means the Wait Period shown in the CyberRisk Declarations. It begins when a total or partial interruption to an *Insured Entity's* business operations is caused by a *First Party Event*. A separate *Wait Period* applies to each unrelated *First Party Event*. |
| *Wrongful Act.* | 1. Means any: |

   a. *Media Act*; or
   b. *Privacy And Security Act*.
2. All *Wrongful Acts* that share a common:
   a. nexus;
   b. set of facts;
   c. circumstance;

© 2020 The Travelers Indemnity Company. All rights reserved.

*Definitions continued from previous page.*

    d.   situation;

    e.   event; or

    f.   decision,

are deemed a single *Wrongful Act* that occurred at the time the first such *Wrongful Act* occurred.

## Exclusions

**Assumed Liability.**    1.   The Insurer will not pay *Loss* arising out of liability assumed by an *Insured*.

      2.   This does not apply:

         a.   when the *Insured* would have been liable in the absence of such assumption of liability;

         b.   to a *Claim* for *Payment Card Contract Penalties*;

         c.   to *Privacy Breach Notification Costs*; or

         d.   to any privacy or confidentiality obligation that the *Insured* has agreed to under a *Privacy Policy* or nondisclosure agreement.

**Bodily Injury.**    1.   The Insurer will not pay *Loss* for:

         a.   bodily injury;

         b.   sickness;

         c.   disease;

         d.   death; or

         e.   loss of consortium.

      2.   This does not apply to:

         a.   emotional distress;

         b.   mental anguish;

         c.   humiliation; or

         d.   loss of reputation.

**Conduct.**    1.   The Insurer will not pay *Loss* arising out of an *Insured's*:

         a.   intentionally dishonest or fraudulent act or omission; or

         b.   willful violation of law or regulation.

      2.   This does not apply to:

         a.   *Defense Costs*; or

         b.   *Loss* other than *Defense Costs*, unless a final nonappealable adjudication in the underlying action establishes such conduct occurred.

      3.   In applying this exclusion, knowledge or conduct of an *Insured* will not be imputed to another *Insured*, except that knowledge or conduct of an *Executive Officer* will be imputed to the *Insured Entity*.

**Cyber Crime.**    The Cyber Crime Insuring Agreements do not apply to:

         1.   indirect or consequential loss;

         2.   potential income, including interest and dividends, not realized by an *Insured* or *Client*;

         3.   loss of confidential information;

         4.   loss of intellectual property;

         5.   loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, or other cards;

         6.   loss resulting from a fraudulent instruction, if the sender or anyone acting in collusion with the sender, ever had authorized access to the *Insured's* password, PIN, or other security code;

         7.   amounts the *Insured* incurs without a legal obligation to do so;

© 2020 The Travelers Indemnity Company. All rights reserved.

*Exclusions continued from previous page.*

8. loss resulting from forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions used as source documentation to enter electronic data or send instructions, provided this does not apply to the Social Engineering Fraud Insuring Agreement;

9. loss resulting from the failure of any party to perform under any contract; or

10. loss due to any nonpayment of, or default upon, any loan, extension of credit, or similar promise to pay.

**Government Action.**
The Insurer will not pay *Loss* arising out of:
1. seizure;
2. confiscation;
3. nationalization;
4. requisition; or
5. destruction of property,
by or under the order of domestic or foreign government authority.

**Infrastructure.**
The Insurer will not pay *Loss* arising out of a total or partial interruption or failure of any:
1. satellite;
2. electrical or mechanical system;
3. electric, gas, water, or other utility;
4. cable, telecommunications, or Internet service provider; or
5. other infrastructure,
except when such is under the *Insured's* control.

**Insured vs. Insured.**
1. The Insurer will not pay *Loss* for a *Claim* brought by or on behalf of:
   a. an *Insured*; or
   b. an entity that, at the time the *Wrongful Act* occurs, or the date the *Claim* is made:
      i. is owned, operated, or controlled by any *Insured*; or
      ii. owns, operates, or controls any *Insured*.
2. This does not apply to a *Claim*:
   a. by an *Insured Person* for contribution or indemnity, if resulting from another covered *Claim*; or
   b. by or on behalf of an *Insured Person* or *Additional Insured* who did not commit or participate in the *Wrongful Act*.

**Intellectual Property.**
The Insurer will not pay *Loss* arising out of an *Insured's* misappropriation, infringement, or violation of:
1. copyrighted software;
2. patent rights or laws; or
3. trade secret rights or laws.

**Labor Disputes.**
The Insurer will not pay *Loss* under the Business Loss Insuring Agreements arising out of labor disputes.

**Licensing And Royalties.**
The Insurer will not pay *Loss* arising out of any obligation to pay licensing fees or royalties.

**Ownership Rights.**
The Insurer will not pay *Loss* for a *Claim* by, or on behalf of, an independent contractor, joint venturer, or venture partner arising out of disputes over ownership rights in *Covered Material*.

**Physical Peril.**
The Insurer will not pay *Loss* arising out of:
1. fire, smoke, or explosion;
2. lightning, wind, rain, or hail;

*Exclusions continued from previous page.*

    3.   surface water, waves, flood, or overflow of any body of water;

    4.   earthquake, earth movement, or earth sinking;

    5.   mudslide, landslide, erosion, or volcanic eruption;

    6.   collapse, wear and tear, rust, corrosion, or deterioration;

    7.   magnetic or electromagnetic fields;

    8.   extremes of temperature or humidity; or

    9.   any similar physical event or peril.

**Pollution.** The Insurer will not pay *Loss* arising out of:

1. the actual, alleged, or threatened discharge, dispersal, see page, migration, release, or escape of a *Pollutant*;

2. a request, demand, order, or statutory, or regulatory requirement that an *Insured* or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess, the effects of, a *Pollutant*; or

3. testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of, a *Pollutant*.

**Prior Acts.** The Insurer will not pay *Loss* arising out of a *Wrongful Act* that occurs prior to the Retro Date shown in the CyberRisk Declarations.

**Prior Matters.** The Insurer will not pay *Loss* arising out of any fact, circumstance, situation, event, or *Wrongful Act*:

1. that is, or reasonably would be regarded as, the basis for a *Claim* under the Liability Insuring Agreements about which any *Executive Officer* had knowledge prior to the Knowledge Date shown in the CyberRisk Declarations;

2. that, prior to the Inception date shown in the Declarations, was the subject of any notice of claim, or circumstance, given by or on behalf of any *Insured* and accepted under any policy of insurance that this Coverage directly renews, replaces, or succeeds in time; or

3. previously alleged in a civil, criminal, administrative, or regulatory proceeding against any *Insured* prior to the P&P Date shown in the CyberRisk Declarations.

**Property Damage.** 1. The Insurer will not pay *Loss* under the Liability or Breach Response Insuring Agreements for the:

    a.   damage to;

    b.   destruction of;

    c.   loss of; or

    d.   loss of use of,

    any tangible property.

2. The Insurer will not pay *Loss* under the Cyber Crime or Business Loss Insuring Agreements arising out of the:

    a.   damage to;

    b.   destruction of;

    c.   loss of; or

    d.   loss of use of,

    any tangible property, other than loss of *Other Property* covered under the Computer Fraud Insuring Agreement.

**Securities Laws.** The Insurer will not pay *Loss* arising out of:

1. a violation of a securities law or regulation; or

2. except under the Cyber Crime Insuring Agreements:

    a.   the ownership of;

    b.   the sale or purchase of; or

    c.   the offer to sell or purchase,

    stock or other securities.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Exclusions continued from previous page.*

| | | |
|---|---|---|
| **Unlawful Collection.** | 1. | The Insurer will not pay *Loss* arising out of the collection of *Confidential Information* in violation of law. |
| | 2. | This does not apply to *Defense Costs*. |
| **Unsolicited Communications.** | 1. | The Insurer will not pay *Loss* arising out of a violation of a law that restricts or prohibits unsolicited communications. |
| | 2. | This does not apply to a *Security Breach* under the Breach Response Insuring Agreements. |
| **War.** | 1. | The Insurer will not pay *Loss* arising out of: |
| | | a.  war, including undeclared or civil war; |
| | | b.  warlike action, including action in hindering or defending against an actual or expected attack, by any government, military force, sovereign, or other authority using military personnel or other agents; or |
| | | c.  insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these. |
| | 2. | This does not apply to an actual or threatened attack against a *Computer System* with intent to cause harm, or further social, ideological, religious, political, or similar objectives, except when in support of 1a through 1c. |

## Limits And Retentions

| | | |
|---|---|---|
| **Limits Of Insurance.** | 1. | The most the Insurer will pay for all *Loss* is the CyberRisk Aggregate Limit shown in the CyberRisk Declarations. |
| | 2. | The most the Insurer will pay for all *Loss* under an Insuring Agreement is the applicable Limit for such Insuring Agreement shown in the CyberRisk Declarations; but: |
| | | a.  The most the Insurer will pay for all *Payment Card Contract Penalties* is the Payment Card Costs Limit shown in the CyberRisk Declarations, which is within and will reduce the Privacy And Security Limit. |
| | | b.  The most the Insurer will pay for all *Business Interruption Loss* that results from a *System Failure* is the System Failure Limit shown in the CyberRisk Declarations, which is within and will reduce the Business Interruption Limit. |
| | | c.  Payment of *Loss* under the Dependent Business Interruption Insuring Agreement and Reputation Harm Insuring Agreement is within and will reduce, the remaining Business Interruption Limit. |
| | | d.  The most the Insurer will pay for all *Accounting Costs* is the Accounting Costs Limit shown in the CyberRisk Declarations, which is within and will reduce the Limit for the applicable Business Loss Insuring Agreement. |
| | | e.  If a Betterment Coparticipation percentage is shown in the CyberRisk Declarations, such percentage of *Betterment Costs* will be paid by the *Insured*. The Insurer will pay the remaining *Betterment Costs*, up to the Betterment Limit shown in the CyberRisk Declarations. |
| | 3. | The most the Insurer will pay for all *Loss* with respect to an *Additional Insured* is the limit agreed to in the agreement between such *Additional Insured* and the *Insured Entity*, or the applicable Limit shown in the CyberRisk Declarations, whichever is less. |
| | 4. | If the CyberRisk Declarations indicates that a Shared Limit applies, the most the Insurer will pay under all Shared Coverages is the Shared Limit shown in the Shared Limit Declarations. |
| | 5. | Once the CyberRisk Aggregate Limit or Shared Limit is exhausted, the premium is fully earned, and all obligations of the Insurer, including any duty to defend, will cease. |
| **Retention.** | 1. | The Insurer will only pay *Loss* once the applicable Retention shown in the CyberRisk Declarations has been paid by the *Insured*. |
| | 2. | Except for the Betterment Insuring Agreement, if multiple Retentions apply to: |

*Limits And Retentions continued from previous page.*

     a.  a *Claim*;

     b.  a *First Party Event*; or

     c.  *Claims* and *First Party Events* that share a common nexus, set of facts, circumstance, situation, event, or decision,

     the *Insured* will not pay more than the amount of the largest applicable Retention.

3.  The *Insured Person* is deemed indemnified by the *Insured Entity* to the extent permitted or required by law, written agreement, or the by-laws of the *Insured Entity*. For the Liability Insuring Agreements, no Retention will apply to an *Insured Person* if indemnification by the *Insured Entity* is:

     a.  not permitted by law; or

     b.  not possible due to the financial insolvency of such *Insured Entity*.

4.  The Insurer may pay any amount of Retention. In such event, the *Insured* agrees to repay the Insurer such amounts.

## Other Conditions

**Allocation.**

1.  Subject to Other Conditions, Settlement, if an *Insured* incurs:

     a.  *Loss* jointly with others who are not covered for a *Claim*; or

     b.  *Loss* covered and loss not covered by this Coverage because a *Claim* includes both covered and uncovered matters,

     then the *Insured* and the Insurer will use their best efforts to allocate such amount between covered *Loss* and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters.

2.  If the CyberRisk Declarations shows that the Insurer has the duty to defend *Claims*, all *Defense Costs* will be allocated to covered *Loss*.

**Cancelation And Nonrenewal.**

1.  The Insurer will cancel this Coverage only if premium is not paid when due. If nonpayment occurs, the Insurer will give at least 20 days written notice of cancelation to the Named Insured. Unless payment is received when due, this Coverage will be canceled.

2.  The Named Insured may cancel any part of this Coverage by giving advanced written notice to the Insurer, stating when such cancelation will be effective.

3.  If any part of this Coverage is canceled, the Insurer will refund the unearned premium on a pro rata basis.

4.  The Insurer is not required to renew this Coverage upon its expiration. If the Insurer elects not to renew, it will provide the Named Insured written notice to that effect at least 60 days before the Expiration date shown in the Declarations.

**Change Of Structure.**

1.  Under the Liability and Breach Response Insuring Agreements, if a *Change Of Control* occurs during the *Policy Period*, the coverage will continue for the *Run-Off Period*.

2.  Coverage during the *Run-Off Period* is only for *Wrongful Acts* or *First Party Events* occurring before such *Change Of Control*.

3.  Under the Cyber Crime and Business Loss Insuring Agreements, if an entity ceases to be an *Insured Entity* during the *Policy Period*, *First Party Loss* is only covered if:

     a.  such *First Party Loss* is sustained; and

     b.  the applicable *First Party Event* is *Discovered*,

     prior to the time such entity ceased to be an *Insured Entity*.

4.  The Named Insured may request to extend the time of the *Run-Off Period*.

**Claim Defense.**

1.  If the CyberRisk Declarations shows that the Insurer has the duty to defend *Claims*, the Insurer:

     a.  has the right and duty to defend covered *Claims*, even if groundless or false;

     b.  has the right to select defense counsel for such *Claims*; and

© 2020 The Travelers Indemnity Company. All rights reserved.

*Other Conditions continued from previous page.*

    c.   has no duty to defend, or to continue to defend, *Claims* after the applicable Limit has been exhausted.

2.   If the CyberRisk Declarations shows that the Insurer does not have the duty to defend *Claims*:

    a.   the *Insured* has the duty to defend *Claims*;

    b.   the Insurer has the right to participate in the selection of defense counsel;

    c.   the Insurer has the right to participate in the investigation, defense, and settlement of such *Claims*;

    d.   subject to the applicable Limit, the Insurer will reimburse the *Insured* for *Defense Costs*;

    e.   upon written request, the Insurer will advance *Defense Costs*; and

    f.   advanced *Defense Costs* will be repaid to the Insurer to the extent that the *Insured* is not entitled to such payment.

3.   With respect to a *Claim*, the *Insured* will not, without the Insurer's prior written consent:

    a.   make an offer to settle, or settle, a *Claim*;

    b.   admit liability; or

    c.   except at the *Insured's* own cost, make a voluntary payment, pay or incur *Defense Costs* or other expense, or assume any obligation.

**Cyber Crime And Business Loss Change.**

The Cyber Crime and Business Loss Insuring Agreements will end upon:

1.   a *Change Of Control*; or

2.   the voluntary liquidation or dissolution of the Named Insured.

**ERP –Automatic.**

1.   The *Automatic ERP* applies without additional premium.

2.   *Claims* resulting from *Wrongful Acts* that occur prior to cancelation or nonrenewal can be made and reported to the Insurer during the *Automatic ERP*. Such *Claim* is deemed reported on the last day of the *Policy Period*.

3.   The most the Insurer will pay for *Loss* resulting from *Claims* reported during the *Automatic ERP* is the remaining portion of the applicable Limit shown in the CyberRisk Declarations as of the effective date of cancelation or nonrenewal.

**ERP –Optional.**

1.   The Named Insured may elect to purchase an *Optional ERP* shown in the CyberRisk Declarations for any reason other than nonpayment of premium. The *Optional ERP* will only take effect if:

    a.   the Insurer receives written notice of such election no later than 90 days after cancelation or nonrenewal; and

    b.   the additional premium for the *Optional ERP* is paid when due.

2.   *Claims* or *Potential Claims* resulting from *Wrongful Acts* that occur prior to cancelation or nonrenewal can be made and reported to the Insurer during the *Optional ERP*. Such *Claim* or *Potential Claim* is deemed reported on the last day of the *Policy Period*.

3.   For the Privacy Breach Notification, Computer And Legal Experts, and Public Relations Insuring Agreements, *First Party Loss* that results from a *First Party Event* occurring prior to cancelation or nonrenewal can be *Discovered* during the *Optional ERP*. Such *First Party Event* is deemed *Discovered* on the last day of the *Policy Period*.

4.   The premium due for the *Optional ERP* is shown in the CyberRisk Declarations. Such premium is fully earned at the start of the *Optional ERP*.

5.   The most the Insurer will pay for *Loss* resulting from *Claims* made, or *First Party Events Discovered*, during the *Optional ERP* is the remaining portion of the applicable Limit shown in the CyberRisk Declarations as of the effective date of cancelation or nonrenewal.

6.   When the *Optional ERP* applies, it replaces the *Automatic ERP* and the Extended Discovery Period for the Privacy Breach Notification, Computer And Legal Experts, and Public Relations Insuring Agreements.

**Extended Discovery Period.**

1.   For the *First Party Insuring Agreements*, the *Insured* has an extended period of time to *Discover* a *First Party Loss* arising out of a *First Party Event* that occurred prior to the effective date of cancelation. Such *First Party Event* will be deemed *Discovered* on the last day of the *Policy*

*Other Conditions continued from previous page.*

*Period.* This period begins on the effective date such *First Party Insuring Agreement* is canceled. It ends on the earlier of:

    a.   90 days; or

    b.   the effective date of similar coverage purchased by the *Insured*, even if such insurance does not provide coverage for loss sustained prior to its effective date.

2.   When *Optional ERP* is purchased, it replaces the Extended Discovery Period for the Privacy Breach Notification, Computer And Legal Experts, and Public Relations Insuring Agreements.

**Income Loss Appraisal.**  If, after submission of the Proof of Loss, the Insurer and *Insured* do not agree on the amount of *Income Loss*, each party will select an appraiser. If the appraisers do not agree, they will select an umpire. Each appraiser will submit the amount of *Income Loss* to the umpire. Agreement by the umpire and at least one of the appraisers as to the amount of *Income Loss* is binding.

Each party will:

1.   pay its own appraiser, except when covered as *Accounting Costs*, and

2.   share the fees and costs of the umpire equally.

**Notice Of Claim.**  1.   If an *Insured* gives the Insurer written notice of a *Potential Claim* during the *Policy Period*, or any extended reporting period, then a *Claim* subsequently arising from such *Potential Claim* will be deemed made on the last day of the *Policy Period*. Such notice must include a description of the anticipated allegations of *Wrongful Acts*, potential damages, and the names of potential claimants and *Insureds* involved.

2.   Once an *Executive Officer* becomes aware that a *Claim* has been made, the *Insured* must give the Insurer written notice of such *Claim* as soon as practicable. If such *Claim* involves facts that are subject to a court order or law enforcement hold, the *Insured* must give the Insurer written notice of such *Claim* as soon as practicable once such order or hold is not in effect. Such notice must include a copy of the *Claim* or description of its particulars.

3.   All notices under this section must be sent to the Insurer at an address shown in the Declarations.

**Notice Of First Party Event.**  1.   Upon the *Discovery* of a *First Party Event*, the *Insured* must give the Insurer written notice of the particulars of such event, as soon as practicable.

2.   If such *First Party Event* causes *First Party Loss* under the Cyber Crime or Business Loss Insuring Agreements in an amount more than 25% of the applicable Retention, the *Insured* must:

    a.   give the Insurer a detailed, sworn Proof of Loss within 120 days;

    b.   submit to an examination Under Oath, and give the Insurer a signed statement of the *Insured's* answers; and

    c.   notify law enforcement, if such *First Party Event* violates law.

3.   Demands for payment of *First Party Loss* must be provided to the Insurer by the *Insured Entity*.

4.   All notices and demands must be sent to the Insurer at an address shown in the Declarations.

**Other Insurance.**  1.   The Breach Response and Business Loss Insuring Agreements are primary insurance.

2.   The Liability and Cyber Crime Insuring Agreements are excess over, and will not contribute with, any other valid and collectible insurance available to the *Insured*. This applies even if such other insurance is stated to be primary, excess, or otherwise, unless such other insurance states by specific reference that it is excess over this Coverage.

**Property Covered.**  Coverage under the Cyber Crime Insuring Agreements is limited to property:

1.   the *Insured Entity*:

    a.   owns;

    b.   leases; or

    c.   holds for others; or

2.   for which the *Insured Entity* is legally liable, except property located inside premises of the *Insured Entity's* client or such client's financial institution.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Other Conditions continued from previous page.*

**Recovery And Subrogation.**
1. The Insurer has no duty to recover amounts paid under this Coverage.
2. Amounts recovered from a third party, less costs incurred in obtaining such recovery, will be applied in this order:
   a. to the Insurer for any Retention it paid on behalf of an *Insured*;
   b. to the *Insured* for *Loss* the Insurer did not pay because the applicable Limit was exhausted;
   c. to the Insurer for *Loss* it paid;
   d. to the *Insured* for any Retention it paid; and then
   e. to the *Insured* for any uncovered loss it paid.
3. Recoveries do not include amounts from insurance or reinsurance.
4. The Insurer is subrogated to, and the *Insured* must transfer to the Insurer, all of the *Insured's* rights of recovery against any person or organization for *Loss* the Insurer has paid under this Coverage. The *Insured* agrees to:
   a. execute and deliver instruments and papers;
   b. do everything necessary to secure such rights; and
   c. do nothing to impair or prejudice those rights.
5. Subrogation will not apply if the *Insured*, prior to the date of a *Wrongful Act* or a *First Party Event*, waived its rights to recovery.
6. Any of the *Insured Entity's* property that the Insurer pays for becomes the Insurer's property.

**Related Claims.**
Multiple *Claims* arising out of the same *Wrongful Act* are a single *Claim* that is deemed first made on the date the earliest of such *Claims* is made, whether before or during the *Policy Period*.

**Representations.**
1. The Insurer has issued this coverage in reliance on the accuracy and completeness of the representations that the *Insured* made to the Insurer.
2. If any such representation is untrue, and:
   a. was material to the acceptance of the risk; and
   b. is material to a covered *Loss*,
   then this coverage will not apply to such *Loss* with respect to:
      i. an *Insured Person* who knew; or
      ii. an *Insured Entity*, if an *Executive Officer* knew,
      that such representation was untrue on the Inception date shown in the Declarations.

**Settlement.**
The Insurer may, with the written consent of the *Insured*, settle a *Claim*. If the Insurer and claimant agree to settle a *Claim* but the *Insured* withholds its consent, the *Insured* will be responsible for 20% of all:
1. *Defense Costs* incurred after the date the *Insured* withheld its consent; and
2. *Loss*, other than *Defense Costs*, in excess of such settlement offer.

**Subsidiaries.**
If a *Subsidiary* is acquired or created by an *Insured Entity* during the *Policy Period*, and its revenues are:
1. less than 35% of the total annual revenues of such *Insured Entity*, then it will be covered for *Wrongful Acts* or *First Party Events* that occur after its acquisition or creation; or
2. are at least 35% of the total annual revenues of such *Insured Entity*, then it will be covered for:
   a. *Wrongful Acts* that occur after its acquisition or creation, for *Claims* made; or
   b. *First Party Events* that occur after its acquisition or creation and that are *Discovered* and reported,
   within 90 days of its acquisition or creation, or the end of the *Policy Period*, whichever is earlier. Additional coverage may be negotiated at the time of acquisition or creation.

© 2020 The Travelers Indemnity Company. All rights reserved.

*Other Conditions continued from previous page.*

| | |
|---|---|
| **Suits Against The Insurer – Cyber Crime.** | The *Insured Entity* may not bring any legal action against the Insurer involving a *First Party Event* covered under the Cyber Crime Insuring Agreements: |

1. until 60 days after the *Insured Entity* has filed Proof of Loss; and
2. unless such legal action is commenced within two years from the date the *Insured Entity* *Discovers* the *First Party Event.*

| | |
|---|---|
| **Valuation Under First Party Insuring Agreements.** | 1. *Money*, except *Virtual Currency*, is valued in the U.S. dollar equivalent determined at the rate of exchange published by The Wall Street Journal: |

    a. for the Cyber Crime Insuring Agreements, on the date the *First Party Event* was *Discovered*; and

    b. for the Breach Response and Business Loss Insuring Agreements, on the date of payment of *First Party Loss.*

2. *Securities* are valued at market value as of the close of business on the date the *First Party Event* was *Discovered*; and at its discretion, the Insurer will:

    a. pay the *Insured Entity* such value;

    b. replace such *Securities* in kind, in which case the *Insured Entity* must assign to the Insurer all rights, title, and interest in such *Securities*; or

    c. pay the cost of a Lost Securities Bond required when issuing duplicates of the *Securities.* Such Lost Securities Bond will have a penalty no more than the value of the *Securities* at the close of business on the date the *First Party Event* was *Discovered.*

3. *Virtual Currency* is valued in the U.S. dollar equivalent determined at the rate of exchange:

    a. for the Cyber Crime Insuring Agreements, on the date the *First Party Event* was *Discovered*; and

    b. for the Breach Response and Business Loss Insuring Agreements, on the date of payment of *First Party Loss.*

4. *Other Property* is valued for the lesser of:

    a. the actual cash value of the *Other Property* on the date the *First Party Event* was *Discovered*; or

    b. the cost to replace *Other Property* with comparable property, but only after such property is actually replaced.

© 2020 The Travelers Indemnity Company. All rights reserved.

This endorsement changes the CyberRisk Coverage.

# Conviction Reward Endorsement

There are three changes described below:

1.  The following is added to **Cyber Crime Insuring Agreements**:

    **Conviction Reward.** The Insurer will pay the *Insured Entity* for *Conviction Reward Costs* following a *First Party Event* that is *Discovered* during the *Policy Period*.

2.  The following is added to **Definitions**:

    *Conviction Reward Costs.* Means the reasonable amount paid by the *Insured Entity*, with the Insurer's prior written consent, for information that leads to the arrest and conviction of a natural person responsible for a *First Party Event*.

3.  The following is added to the **CyberRisk Declarations**:

|  | Limit | Retention |
| --- | --- | --- |
| Conviction Reward: | $25,000 | 0 |

This endorsement changes the CyberRisk Coverage.

**Bricked Equipment Endorsement**

There are three changes described below:

1.  The following is added to **Definitions**, *Extra Expense*:

    Includes such reasonable costs incurred by the *Insured Entity*, with the Insurer's written consent, to replace any *Bricked Equipment* with functionally equivalent equipment, if such *Bricked Equipment* is inoperable:

    1.  directly as a result of a *Security Breach*; and
    2.  if reasonable attempts to restore such *Bricked Equipment* fail.

    Such costs may include newer versions or models of such *Bricked Equipment.*

2.  The following is added to **Definitions**:

    *Bricked Equipment.* Means any inoperable computer, input, output, processing, storage, or communication device:

    1.  owned by;
    2.  leased to;
    3.  licensed to; or
    4.  under the direct operational control of,

    the *Insured Entity* , or an *Insured Person,* while authorized by, and transacting business on behalf of, the *Insured Entity.*

3.  The following is added to **Exclusions**, **Property Damage** 2:

    This does not apply to *Business Interruption Loss* resulting from the loss of use of a *Computer System.*

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2019 The Travelers Indemnity Company. All rights reserved.

**Vendor Or Client Payment Fraud
Endorsement**

This endorsement changes the CyberRisk Coverage.

There are ten changes described below:

1.  The following is added to **Cyber Crime Insuring Agreements**:

    **Vendor Or Client Payment Fraud.**

    The Insurer will pay the *Insured Entity* for *Vendor Or Client Payment Fraud Loss* that arises out of a *Security Breach* that is discovered during the Policy Period.

2.  The following is added to **Definitions**:

    *Vendor Or Client Payment Fraud*. Means an instruction that intentionally misleads a *Vendor* or *Client*, when such instruction:
    1.  is not made by an *Insured*;
    2.  is purportedly from an *Insured*;
    3.  directs such *Vendor* to perform services or deliver goods, or such *Client* to deliver payment to, an unintended recipient;
    4.  contains a misrepresentation of material fact; and
    5.  is relied upon by such *Vendor* or *Client*, believing the material fact to be true.

    *Vendor Or Client Payment Fraud Loss*. Means:
    1.  *Money* owed to the *Insured Entity* but not collected for services rendered or goods delivered to a *Client*, or
    2.  the amount the *Insured Entity* paid a *Vendor* for goods or services the *Insured Entity* did not receive;
    directly caused by *Vendor Or Client Payment Fraud*.

3.  The following is added to **Definitions**, *Computer Fraud*:

    Does not include *Vendor Or Client Payment Fraud*.

4.  The following is added to **Definitions**, *First Party Event*:

    Includes *Vendor Or Client Payment Fraud*.

5.  The following is added to **Definitions**, *First Party Loss*:

    Includes *Vendor Or Client Payment Fraud Loss*.

6.  The following is added to **Definitions**, *Funds Transfer Fraud*:

    Does not include *Vendor Or Client Payment Fraud*.

7.  The following replaces **Exclusions**, *Cyber Crime*, 8:

    loss resulting from forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions used as source documentation to enter electronic data or send instructions, provided this does not apply to the Social Engineering Fraud or the Vendor Or Client Payment Fraud Insuring Agreements.

8.  The following is added to **Other Conditions**, **Property Covered**:

    This does not apply to the Vendor Or Client Payment Fraud Insuring Agreement.

9.  The following is added to **Other Conditions**:

    **Property Covered – Vendor Or Client Payment Fraud**

    Coverage under the Vendor Or Client Payment Fraud Insuring Agreement is limited to:
    1.  *Money* owed to the *Insured Entity* but not collected for services rendered or goods delivered to a *Client*, or
    2.  the amount the *Insured Entity* paid a *Vendor* for goods or services the *Insured Entity* did not receive.

---

10. The following is added to the Declarations:

Vendor Or Client Payment Fraud Limit

$100,000

Vendor Or Client Payment Fraud Retention

$5,000

© 2019 The Travelers Indemnity Company. All rights reserved.

**Dependent Business Interruption – System Failure Endorsement**

This endorsement changes the CyberRisk Coverage.

There are five changes described below:

1. The following is added to **Business Loss Insuring Agreements**, **Dependent Business Interruption**:

   The Insurer will also pay the *Insured* for its *Business Interruption Loss*, directly caused by an *IT Provider System Failure* that is *Discovered* during the *Policy Period*.

2. The following is added to **Definitions**, *First Party Event*:

   Includes an *IT Provider System Failure*.

3. The following is added to **Definitions**:

   *IT Provider System Failure.* Means an accidental, unintentional, and unplanned total or partial interruption of an *IT Provider's* computer system not caused by an *IT Provider Breach*.

4. The following is added to **Exclusions**, **Property Damage**, 2:

   This does not apply to *Business Interruption Loss* resulting from the loss of use of an *IT Provider's* computer system.

5. The following is added to **Limits And Retentions**, **Limits Of Insurance**, 2:

   The most the Insurer will pay for *Business Interruption Loss* that results from an *IT Provider System Failure* is the Dependent Business Interruption - System Failure Limit shown in the CyberRisk Declarations, which is within and will reduce the Dependent Business Interruption Limit.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2020 The Travelers Indemnity Company. All rights reserved.

This endorsement changes the CyberRisk Coverage.

**Dependent Business Interruption - Outsource Provider With System Failure Endorsement**

There are five changes described below:

1.  The following is added to **Business Loss Insuring Agreements**, **Dependent Business Interruption**:

    **Dependent Business Interruption - Outsource Provider - System Failure.**

    The Insurer will pay the *Insured* for its *Business Interruption Loss,* directly caused by an *Outsource Provider Breach* or *Outsource Provider System Failure* that is *Discovered* during the *Policy Period*.

2.  The following is added to **Definitions**, *First Party Event*:

    Includes an *Outsource Provider Breach* and *Outsource Provider System Failure*.

3.  The following are added to **Definitions**:

    *Outsource Provider*. Means a provider, other than an *IT Provider*, that:
    1.  provides goods to, or performs services for, the *Insured* under a written contract; and
    2.  the *Insured* does not own, operate, or control.

    *Outsource Provider Breach*. Means:
    1.  the unauthorized access to;
    2.  the use of authorized access to cause intentional harm to;
    3.  a denial-of-service attack against; or
    4.  the introduction of a *Virus* into,
    an *Outsource Provider's* computer system, resulting in an interruption of such computer system.

    *Outsource Provider System Failure*. Means an accidental, unintentional, and unplanned interruption of an *Outsource Provider's* computer system not caused by an *Outsource Provider Breach*.

4.  The following is added to **Exclusions**, **Property Damage**, 2:

    This does not apply to *Business Interruption Loss* resulting from the loss of use of an *Outsource Provider's* computer system.

5.  The following is added to **Limits And Retentions**, **Limits Of Insurance**, 2:

    The most the Insurer will pay for all *Business Interruption Loss* that results from an *Outsource Provider Breach* or *Outsource Provider System Failure* is the Dependent Business Interruption - Outsource Provider - System Failure Limit shown in the CyberRisk Coverage Declarations, which is within and will reduce the Dependent Business Interruption Limit.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

© 2020 The Travelers Indemnity Company. All rights reserved.

**Amend Privacy And Security Act To Include**
**Violation Of The General Data Protection**
**Regulation Endorsement**

This endorsement changes the CyberRisk Coverage.

The following is added to **Definitions**, *Privacy and Security Act*:

Includes a violation of the General Data Protection Regulation (GDPR).

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number:  **106328657**

© 2019 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

---

## MICHIGAN CANCELLATION AND NONRENEWAL ENDORSEMENT

This endorsement modifies insurance provided under the following if applicable:

**Liability Policy**
**Kidnap and Ransom Policy**
**Identity Fraud Expense Reimbursement Policy**

---

**It is agreed that:**

The CANCELLATION section of this policy is replaced by the following:

CANCELLATION

The Company may cancel this policy   for failure to pay a premium when due, in which case
**(twenty) (20)** days (number of days must equal or exceed twenty (20) days) written notice
shall be given to the **Named Insured or Insurance Representative**, unless payment in full is received within twenty (20) days of the **Named Insured or Insurance Representative's** receipt of such notice of cancellation. The Company shall have the right to the premium amount for the portion of the **Policy Period** during which this policy was in effect.


Subject to the provisions set forth in Liability Coverage Terms and Conditions Section III. CONDITIONS K. CHANGE OF CONTROL, if applicable, the **Named Insured or Insurance Representative** may cancel any coverage by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured or Insurance Representative** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this policy upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured or Insurance Representative** written notice to that effect
**(forty-five) (45)** days (number of days must equal or exceed forty-five (45) days) before the
Expiration Date set forth in ITEM 2 of the  Declarations.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106328657**

---